USA v. JASON GMOSER, Case No. 14-20048   Jury Trial (02/09/16)

E-FILED
Monday, 25 September, 2017  04:55:09 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

                             Docket No. 14-20048

          Plaintiff,

   vs.                      Urbana, Illinois
                             February 9, 2016
                             9:20 a.m.

JASON T. GMOSER,

          Defendant.

JURY TRIAL -- DAY 2 of 5

BEFORE THE HONORABLE COLIN S. BRUCE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiff:  ELLY M. PEIRSON, ESQUIRE
                    Assistant United States Attorney
                    201 South Vine Street
                    Urbana, Illinois 61802
                    217-373-5875

                    KEITH A. BECKER, ESQUIRE
                    U.S. Department of Justice
                    Child Exploitation & Obscenity Section
                    1400 New York Avenue, N.W.
                    6th Floor
                    Washington, D.C. 20530
                    202-305-4104

For the Defendant:  BRADLEY M. KRAEMER, ESQUIRE
                    COURTNEY CAPARELLA-KRAEMER, ESQUIRE
                    Caparella-Kraemer & Associates, LLC
                    4841A Rialto Road
                    West Chester, Ohio 45069
                    513-942-7222

Court Reporter:  LISA KNIGHT COSIMINI, RMR-CRR
                  U.S. District Court
                  201 South Vine, Suite 344
                  Urbana, Illinois 61802

Proceedings recorded by mechanical stenography; transcript produced by computer.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)    2

I  N  D  E  X

Page

PRELIMINARY MATTERS ............................  3


EVIDENCE ON BEHALF OF THE GOVERNMENT:

    DANIEL E. O'DONNELL
    Continued Direct Examination by Mr. Becker ....   6
    Cross-Examination by Mr. Kraemer .............  41
    Redirect Examination by Mr. Becker ...........  54
    Recross-Examination by Mr. Kraemer ...........  57

    DANIEL JOHNS
    Direct Examination by Mr. Becker .............  59
    Cross-Examination by Mr. Kraemer ............. 108
    Redirect Examination by Mr. Becker ........... 116

    PAMELA KIRSCHNER
    Direct Examination by Ms. Peirson ............ 119

```
1              (In open court; jury absent, 9:20 a.m.)

2              THE COURT:  All right.  It's approximately

3    9:20.  Hey, we're right on time.  We have all the jurors

4    present.

5              Mrs. Peirson, any reason not to bring the jury

6    in?

7              MS. PEIRSON:  No, Your Honor.

8              THE COURT:  Mr. Kraemer?

9              MR. KRAEMER:  No, sir.

10             THE COURT:  All right.  Let's bring them in.

11             (Brief pause in proceedings.)

12             THE COURT:  Mr. O'Donnell, you can come back up

13   and get back on the stand.

14             (Brief pause in proceedings.)

15             (Jury present, 9:22 a.m.)

16             THE COURT:  All right.  Have a seat.  I'm glad

17   to see everybody made it back safe and sound.

18             Let me tell you a very brief story; and I try

19   not to waste your time, so I'll try to make this quick.

20   You might have discovered yesterday afternoon that this

21   building oftentimes gets both cold and dry.

22             I have a lot of authority, but my authority

23   over GSA, who controls the building, is limited.  I

24   emailed them twice yesterday, and we have what I consider

25   to be a good GSA supervisor.  Our temperature controls in
```

1   this building -- remember, it's a government building --

2   they're controlled by Indianapolis.  So I emailed our

3   supervisor for the building; and I said, "Look, I need

4   the temperature up in the courtroom."  And she did her

5   best and talked to Indianapolis; and they raised it up,

6   yes, two whole degrees.  So this morning it is two

7   degrees warmer.

8           Now, I try not to waste your time, but I am

9   going to tell you a very quick story about a famous judge

10  in Texas, a district judge in Texas, who got into a fight

11  with GSA one summer because the air conditioning in the

12  building was drawing -- it was drawing too much.  So GSA

13  turned off the air conditioning -- at least, you know,

14  turned it down so it got hotter in the building.  And the

15  judge got angry about that and told the Marshal Service,

16  "Go out and turn the thermometers down so the air

17  conditioning kicks on."

18          That worked for a few days until the marshals

19  came back one day, and they said, "There's a metal cage

20  that GSA has installed over the front of it."

21          So the judge said, "That's fine.  I'm the

22  judge.  Tear it off."  So they tore it off, turned it

23  down for a few days.

24          As the trial went on the next week, the

25  marshals came back and said, "There's no longer a control

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   there.  Now there's a black box."  And after some

2   investigation, they found out it was being controlled by

3   a computer now from the GSA office in the basement of the

4   building.  That lasted for one day because that night the

5   judge told the marshals to go down there and take care of

6   it, and he -- the judge had his own ideas about how to

7   take of it.

8         The next day when GSA came in, they found their

9   doors chained and padlocked and all their furniture out

10  in the parking lot.  That ended that fight between the

11  judge and GSA.

12        I like our GSA person.  She tries to help me,

13  so I'm not going to do something like that.  But if you

14  do find yourself getting cold, I do have a -- right there

15  at the edge where my courtroom deputy is, there's a

16  thermometer; and that's the official GSA thermometer,

17  which I can see.  Right now it's 70 degrees, so actually

18  it's gone up another half degree since we've been here.

19        If I see it's getting cold, I do email -- if

20  you see me typing, I do email and say things like, "Can

21  you raise it up?"  Again, it goes from me, to the

22  supervisor, to Indianapolis.  So we'll see.

23        Likewise, if you see me rubbing my eyes

24  sometimes, I'm not tired.  It gets very dry in here,

25  especially during the winter.  If you need to take a

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   break because you're either getting cold and want to move

2   around or get, your eyes get dry -- just catch my

3   attention or my courtroom deputy's attention, wave your

4   hand, and we'll take a quick break.  And if you need to

5   use Visine or something, that's fine.  All right?

6           That didn't take too much time.  I really try

7   not to waste your time, so that was that.

8           All right.  We had Mr. -- Agent O'Donnell on

9   the stand.  He is still here.  You understand you're

10  still under oath?

11          WITNESS O'DONNELL:  I do, Your Honor.

12          THE COURT:  All right.  Mr. Becker, you may

13  proceed.

14          MR. BECKER:  Thank you, Your Honor.

15  DANIEL E. O'DONNELL, previously sworn and remaining under

16          oath, resumes testimony, 9:25 a.m.,

17      CONTINUED DIRECT EXAMINATION BY MR. BECKER:

18  Q    Good morning, Special Agent O'Donnell.

19  A    Good morning.

20  Q    When we left off yesterday, we were discussing

21  Government Exhibit 1K, the index of the board as it

22  appeared to a registered member.  I'm going to ask you to

23  look at Government Exhibit 1K again briefly.

24          Just for reference, Special Agent O'Donnell,

25  can you just remind us what page of The Love Zone, or

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   TLZ, is 1K?

2        A    This is the main home page, or index page,

3   after you were approved and signed in as a full member of

4   the site.  In this case, this particular account was a

5   VIP member, so it had additional access as well.

6        Q    Would administrators of the site be able to see

7   all of these particular forums?

8        A    Yes.

9        Q    And more?

10       A    Yes.

11       Q    What additional sort of forums would an

12  administrator or a co-administrator have access to?

13       A    The administrators had access to the entire

14  site.  There was an administrator section of the site

15  that was limited to just them.

16       Q    So there's a term I'd just like you to briefly

17  explain.  About halfway down the page on 1K, there are

18  different forums for, quote, softcore boys and girls and

19  hardcore boys and girls.  You've explained what hardcore

20  meant.  What did "softcore" mean in the context of this

21  site?

22       A    "Softcore" in general meant no penetration,

23  still naked, posing in sexual poses; but there, in

24  general, was not vaginal or anal penetration.

25            MR. BECKER:  Your Honor, the parties have

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    reached a number of stipulations.  At this point, we

2    would request, if the Court would do so, to enter

3    Stipulation Number 2.

4         THE COURT:  Stipulation Number 2.  Ladies and

5    gentlemen, the parties stipulate and agree as follows:

6    On September 30, 2014, FBI Special Agent Danica Dudas

7    connected to the Tor network, accessed the Tor hidden

8    service website "The Love Zone," logged into the website

9    using the account of a site user, pursuant to that user's

10   consent, and used a public available -- excuse me, a

11   publicly available software tool to document postings and

12   information available on the website.  Government's

13   Exhibits 2A, 2B, 2C, and 2D consist of fair and accurate

14   depictions of postings and information available on the

15   website as of September 30, 2014.

16        At this time, are you moving to admit those

17   exhibits into evidence?

18        MR. BECKER:  We are moving to admit Government

19   Exhibits 2A, 2B, 2C, and 2D, Your Honor.

20        THE COURT:  Pursuant to stipulation, those

21   exhibits are now admitted.

22        MR. BECKER:  Thank you, Your Honor.

23   BY MR. BECKER:

24        Q    Special Agent O'Donnell -- may I approach the

25   witness, Your Honor?

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1              THE COURT:  You may.
 2       Q    Handing you what's been marked as Government
 3  Exhibits 2A, 2B, 2C, and 2D, do you recognize those
 4  exhibits?
 5       A    I do.
 6       Q    Are you familiar with FBI Special Agent Danica
 7  Dudas?
 8       A    Yes.
 9       Q    Is she someone who worked on your team, or your
10  squad, while you were at the Major Case Coordination
11  Unit?
12       A    Yes.  She was one of the team members.
13       Q    These particular screen shots in 2A through D,
14  were those done in the same general manner as the screen
15  shots that you took during your undercover sessions on
16  TLZ?
17       A    Yes.
18       Q    Have you reviewed digital copies of Government
19  Exhibits 2A, 2B, 2C, and 2D on the trial laptop?
20       A    Yes.
21       Q    Do they consist of fair and accurate digital
22  copies of those exhibits?
23       A    Yes.
24              MR. BECKER:  Your Honor, permission to publish
25  2A through 2D digitally.
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1          THE COURT:  You may publish.

2     BY MR. BECKER:

3          Q     Special Agent O'Donnell, let's start with

4     Exhibit 2A.  What does Exhibit 2A depict?

5          A     This is a depiction of the profile page for

6     Argonaut.  Every user on the site had a profile page.

7     That profile page consisted of various information.

8                In this case, for the user account Argonaut, on

9     the left-hand side, you see there's an image of an,

10    appears to be an early pubescent male.  That's an avatar,

11    or a profile picture, that the user chose.  These avatar

12    pictures could be changed by the users, you know, as they

13    wanted.

14               In the middle of the page, the username

15    "Argonaut" is at the top.  The rank of the user was

16    listed below that.  In this case, Argonaut was a

17    co-administrator who was promoted on March 20th of 2014.

18               The contribution message is on there as well.

19    This is that green banner similar to the green banner

20    that went across the previous screen, just identifying

21    how many days they had left to make a valid contribution.

22               The contribution dates are there as well, and

23    then the groups that this member was a part of.  In this

24    case, it was the co-administrator group.

25          Q     Now, can you just remind us:  There's that

1  contribution period and contribution deadline, if we can

2  zoom in on that in the middle.  What does that pertain to

3  with respect to the site?

4      A    This was the period in which the user had to

5  make -- had to post a contribution that was approved by

6  the administrative team in order to keep their access.

7  If they failed to do so in that period, then their

8  particular access would be revoked.

9      Q    We move towards the bottom right of Exhibit 2A.

10  What sort of statistics were contained about the user

11  Argonaut?

12      A    These statistics started with the date that

13  the, the user joined.  In this case for Argonaut, the,

14  the user joined the website on April 23rd of 2013.  The

15  last visit, at least as of the date that this particular

16  screen capture was taken, was September 13th of 2014.

17          "Warnings" was simply if other users or the

18  administrative team had a complaint about a user; that

19  statistic would show up here.

20          The total number of posts, these are the -- or

21  this is the total number of posts that were made by the

22  user Argonaut from the date he joined through the date of

23  this screen capture.  And so here the, the total number

24  of posts that were made by this user were 2,096.

25          The last approved contribution, that, again, is

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1  that contribution period.  So in this case, the last

2  approved contribution made was August 24th of 2014.

3         Below that is the total number of contributions

4  that were made by Argonaut.  So in this case, there were

5  361 out of the over 2,000 posts that were, that qualified

6  as approved contributions.

7      Q    And under that "Total Contributions," there's a

8  number of sort of separate statistics.  One of them

9  states 338 posts of a certain type.  Can you explain

10  that?

11     A    So they, they categorize by the specific type

12  of contribution that was made.  In this case, there were

13  338 posts that were made to the preteen/early teen

14  hardcore sections of the site.  The remaining relatively

15  small number were made in the jailbait, news, and the art

16  section.

17     Q    Showing you Government's 2B, what's depicted in

18  Government's 2B?

19     A    This is a partial listing of the total

20  contributions made by the user Argonaut.  So this is --

21  the, the first page, this was accessible from the, the

22  profile page; and it lists the date and time the

23  contribution was made, the title of the post.  The middle

24  section in green is the section of the site that that

25  post was made.  If you could click on that particular

1   section, it would take you directly to that post.

2           So in this case, some of the post titles up

3   top -- the first one is listed "Boyparty (7-10yo),"

4   "FountainNN," which in this context stands for non-nude,

5   "(7yo)."

6       Q    So what did those -- those sorts of indications

7   in the name of a post, "7-10yo," "7yo," were those

8   generally accurate descriptions in terms of what was

9   depicted in a posting?

10      A    In general, yes.

11      Q    Now, is this a complete list of all of

12  Argonaut's postings?

13      A    No.  This is simply the first page of the

14  listings of his contributions.

15      Q    If we move over to the right side of the

16  exhibit, can you see how many total web pages those would

17  actually take up?

18      A    15 pages.

19      Q    And each line on this particular, this

20  particular page refers to a separate posting by that

21  user?

22      A    Yes.  Each line is a separate contribution.

23      Q    I'll show you Government's Exhibit 1-O.

24  Showing you the first page of Government's Exhibit 1-O,

25  what's depicted on 1-O?

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1        A      This is a specific -- or a particular post that

2   was made to the site in the TLZ Rules and Tutorial

3   section that was made by Argonaut.

4        Q      If we zoom in on the title, what was the title

5   of the posting?

6        A      The title was "[Advanced] Hidden FTP Server."

7        Q      The date of it?

8        A      The date it was posted was March 20, 2014.

9        Q      Before we get to its content, on the right side

10  of Exhibit 1-O, is there an avatar associated with

11  Argonaut?

12       A      Yes.

13       Q      And can you just describe its general content?

14       A      The avatar depicts a naked prepubescent male

15  with his legs spread and his genital area exposed.

16       Q      Now, that's a different avatar, as you called

17  it, from the one we previously saw with the, associated

18  with Argonaut.  Why is that?

19       A      Correct.  The difference was due to the

20  difference in the, the time these particular screen

21  captures were taken.  So somewhere in between the time

22  the previous screen capture was, was taken and this, this

23  screen capture, the user Argonaut had changed that

24  profile, or avatar picture.

25       Q      A user could select whatever avatar they wished

1   to sort of publish to the site; is that fair?

2       A    Correct.

3       Q    And what was the general content of this

4   particular posting?

5       A    In general, he's speaking of setting up an FTP

6   server.  An FTP server stands for "file transfer

7   protocol."  It's simply another protocol that allows for

8   files to be stored and shared between servers and clients

9   or other computers and -- that are shared over the

10  Internet.

11          So in this particular post, he's describing

12  some of the risks that go with setting up an FTP server

13  and how a user might be able to accomplish setting up

14  that server within the Tor network.

15      Q    If we can zoom in just on the first paragraph

16  here, if you can, just read for us the second sentence of

17  the first paragraph, starting with "FTP uses."

18      A    "FTP uses commands which specify an IP address

19  and port to connect to when transferring files, so you

20  should be well aware this could be potentially dangerous

21  if you set it up incorrectly."

22      Q    What is the danger that's being referenced

23  here?

24      A    The potential that certain identifying --

25          MR. KRAEMER:  Objection, speculative.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1              THE COURT:  Well, he's an expert on this type
 2   of -- overruled.  He's an expert.  This is within the
 3   purview of his expertise.  So within the context of that,
 4   I believe he can properly explain what "dangerous" means.
 5        A    In this particular context, what he's referring
 6   to is the dangers of having certain identifying
 7   information associated with a user's computer potentially
 8   being exposed.
 9        Q    And what's stated in the next sentence where
10   the user gives some more context on that, starting with
11   "the way I figured"?
12        A    "The way I figured out how to set it up is
13   completely safe and does not reveal any IPs as long as
14   certain measures are followed."
15        Q    Does the rest of the post give detailed
16   instructions about how to set up this sort of server?
17        A    Yes.
18        Q    And how many total pages or single pages does
19   that consist of?  You can refer to the paper exhibit if
20   that's easier.
21        A    I don't have the paper exhibit for 1-O in front
22   of me.
23        Q    I'm sorry.  Let me retrieve that.
24             MR. BECKER:  May I approach, Your Honor?
25             THE COURT:  You may.
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1     Q     Sorry.  Handing you Government's Exhibit 1-O.

2     A     So the total topic or, in this case is

3   approximately three pages.

4     Q     And just for the record, publishing the second

5   page of Exhibit 1-O.  And the third page of Exhibit 1-O.

6           Special Agent O'Donnell, I'm going to show you

7   Government's Exhibit 2C.  Before I do, during this

8   particular undercover session, were contribution postings

9   by Argonaut documented by the FBI agent?

10    A     Yes.

11    Q     Is this one of those?

12    A     Yes.

13    Q     Showing you Exhibit 2C, starting at the top

14  left, in what section of the website was this posting

15  made?

16    A     This post was made to the "Hardcore Boys Vids"

17  section.  "Vids" is short for videos.

18    Q     What was the title of the posting thread?

19    A     The particular title was "VideoKidsBrazil01 and

20  02."

21    Q     And can you explain to us:  What, what user

22  made the first posting within this particular thread or

23  topic?

24    A     So the, the first post here was actually made

25  by a user named Topbl, T-o-p-b-l, on July 24th of 2014.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1        Q      And what did that user's post contain?

 2        A      This post contained hyperlinks to a full video

 3   file in addition to the preview image, the top of which

 4   is displayed at the bottom of the screen.

 5        Q      Moving to page 2 of Government's Exhibit 2C,

 6   did the user Argonaut respond with a posting of his own?

 7        A      Yes.

 8        Q      What was the date of the posting?

 9        A      This response was posted on July 29th of 2014.

10        Q      What text did the user include within the post?

11        A      The text is, "This version is still screwed up,

12   but at least you can seek around to get to the other

13   stuff in the video."

14        Q      Did Argonaut include a preview panel or

15   storyboard?

16        A      Yes.

17        Q      Do you see that as we scroll down on Government

18   Exhibit 2C?

19        A      Yes.

20        Q      Can you please describe the images on that

21   storyboard panel?

22        A      These images depict two prepubescent, or early

23   pubescent, males.  The -- who are, appear to be naked or

24   partially naked, including the bottom two panels in which

25   at least one of the males is naked with his legs spread
```

1    apart and his penis exposed in his left hand.

2         Q    Referencing the panels on the fourth row

3    visible on 2C, third and fourth from the left, what

4    appears to be the focal point of those two images?

5         A    The boy's penis and genitalia.

6         Q    Moving to the third page of Government

7    Exhibit 2C, if we can zoom in on the bottom, did Argonaut

8    include other information in connection with the posting?

9         A    Yes.  So the, the first hyperlink is the backup

10   preview.  That is that required backup preview that would

11   contain the same information as the live preview on the

12   site.

13              Below that are the hyperlinks to those external

14   websites that contain the entire video depicted in the

15   preview image.  In this case, it was divided into two

16   separate parts.

17              And then below that is the password that was

18   required to access that video after the user downloaded

19   the files.

20        Q    Showing you Government's Exhibit 2D, in what

21   section of the website was this posting contained?

22        A    This was also contained within the Hardcore

23   Boys Vids section.

24        Q    What was the name of the posting topic?

25        A    This topic was named "BoyParty[7-10yo]."

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1       Q     What user made the initial posting within the

2  topic or thread?

3       A     So this user was made by the -- or this post

4  was made by the user KIPornoLover.

5       Q     We move to page 2 of Government's Exhibit 2D.

6  Did the user Argonaut make a post in response on this

7  thread?

8       A     Yes.  This post was made by Argonaut on

9  August 24, 2014.

10      Q     And what was the -- what was the text included

11  in Argonaut's post here?

12      A     The text here was, "I stumbled across this

13  file.  Looks like it's part 4 which goes with part 1

14  (Boyparty) MJ 6Yo Boy (With Dad).mpg."

15      Q     Was it common for users to post messages like

16  this where they sort of filled in another portion of a

17  video or images that had already been posted to the site?

18      A     It was a common occurrence.  Yes.

19      Q     Did Argonaut include a preview or storyboard?

20      A     Yes.

21      Q     Can you see that on the second page of 2D?

22      A     Yes.

23      Q     Please describe what's visible in those

24  storyboard images.

25      A     So this appears to depict a prepubescent, or

1   toddler, male who's naked, who's sitting between what

2   appears to be an adult, naked adult male.  The

3   prepubescent male appears to be masturbating and holding

4   on to the adult male's erect penis.

5          Q    Moving to page 3 of 2D, did Argonaut include

6   information about where a user could go to download this

7   video?

8          A    Yes.  Similar as before, it, this post

9   contained the backup preview of the same preview image,

10  as well as a hyperlink to the video file that he had

11  uploaded and then the password to access that file.

12         Q    Did other users of TLZ respond to Argonaut's

13  posting of this particular video?

14         A    Yes.

15         Q    And what do you see on here that tells you

16  that?

17         A    Below the Argonaut's post, immediately below in

18  the red or pink text where it, it states that Argonaut

19  has been thanked by specific users.  Those were users who

20  had accessed this post, and there was a way on the site

21  that you could just thank that user for making that post.

22              Below that is another reply to that post that

23  was made by another user, in this case the user Cardizem.

24         Q    Special Agent O'Donnell, I want to move to a

25  little bit of a different topic.  Can you remind us how

1    users, or what private messaging was on the TLZ website?

2        A    So private messages -- there was a feature on

3    the site that allowed users to communicate with each

4    other one on one without other users having access to

5    those posts.  So in that regard, it's easiest to think

6    about it similar to an email that you would be emailing

7    with one other person.

8            MR. BECKER:  Your Honor, at this time, we would

9    ask to enter Stipulation Number 3 that the parties have

10   reached.

11           THE COURT:  Stipulation Number 3.  Ladies and

12   gentlemen, the parties have stipulated and agreed:

13   Between September and December of 2014, two foreign law

14   enforcement agencies provided copies of website data

15   pertaining to "The Love Zone" to the FBI.  Exhibits 15

16   through 19 consist of fair and accurate depictions of

17   postings and private messages pertaining to user

18   "Argonaut" on the website "The Love Zone" as of December

19   of 2014 when the website ceased operating.

20           Do you wish to move to admit Exhibits 15

21   through 19?

22           MR. BECKER:  We do, Your Honor.  At this time,

23   we move to admit Exhibits 15, 16A, 16B, 17 A, 17B, 18,

24   and 19A through G inclusive.

25           THE COURT:  Those are all stipulated to, and

1   they are admitted.

2   BY MR. BECKER:

3       Q    Special Agent O'Donnell, I'm handing you the

4   exhibits we just referenced, 15 through 19.

5            Before we get to these, can you just explain

6   the, the format that we're going to see in Exhibits 15

7   through 19?  And how does that differ from the website

8   postings and screen shots that we've seen so far?

9       A    The text is the same.  The formatting was

10  changed to make it slightly easier to read.  This is in

11  a, a Word format as opposed to the, the screen capture

12  format that we had taken that just made it more difficult

13  to sort through the messages.

14      Q    So the, the text that appears on 15 through 19

15  is the text that would have appeared in messages and

16  postings on the site?

17      A    It's the same text.  Yes.

18      Q    Fair to say that's -- it's not how it would

19  have appeared to the eyes of a user necessarily?

20      A    That's correct.

21      Q    And as we heard in the stipulation, this was

22  information that was received from foreign law

23  enforcement agencies and then sent to the FBI?

24      A    That's correct.

25      Q    Showing you Government's Exhibit 15, so first

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   let's start from the top and if you could explain:  What,

2   what information does this exhibit, does this exhibit

3   show?

4        A    So this is a conversation between the user Neo

5   and the user Argonaut through the private messaging

6   feature on the site.  This particular message was

7   initially sent on March 11th of 2014 from Neo to

8   Argonaut.

9        Q    And what was Neo's message to Argonaut on

10  March 11th of 2014?

11       A    Neo is asking Argonaut if he knew anything

12  about this, this post.

13           The post he's referring to is the one, the

14  information directly below that sentence that was sent to

15  Neo from another user on the site who had attempted to

16  make a post to the site and was questioning why it had

17  not been approved up to that point.

18           So Neo was forwarding this question to

19  Argonaut.

20       Q    Sort of the equivalent of a forwarded email

21  from one person to another?

22       A    Correct.

23       Q    There's a term that's contained in a couple of

24  lines down into that forwarded email, "BIBCAM 13yo."

25  What does "BIBCAM" mean?

1      A      In this context, "BIB" stands for "boy in

2   bedroom."   The "CAM" is, refers to a webcam type capture

3   of, of -- video of that.

4      Q      And is a reply by Argonaut included within

5   Government's 15?

6      A      Yes.

7      Q      And what did Argonaut indicate regarding this

8   question by this user?

9      A      He's stating here that this particular post was

10  prior to his promotion to moderator, but that he has the

11  video.  He would consider it to be PT.  In this context,

12  that stands for "preteen."  And so he went ahead and

13  approved the post.

14     Q      Showing you Government's Exhibit 16A, what

15  users was this message between?

16     A      So this is a conversation between the users

17  Argonaut and CWK.  This particular message, the initial

18  message was sent on August 30th of 2014 from Argonaut to

19  CWK.  He's asking, "Haven't seen you on TC."  That is, in

20  this context, short for TorChat, which is that instant

21  messaging feature that was utilized by numerous members

22  of TLZ.  And he's asking if he's doing okay.

23           CWK replies that he just hasn't had his TorChat

24  account with him.

25           And then Argonaut replies to that, stating that

1  he's found that being an admin is a ton of work and a lot

2  of clerical work.

3      Q    Now, in order to communicate via TorChat would

4  Argonaut and CWK have to exchange any information?

5      A    Their TorChat IDs, or identities, which is a

6  unique username similar to that 16-character string of

7  letters and numbers that you would have seen for the, the

8  actual address of TLZ or other hidden services.

9      Q    Showing you Government's 16B, what -- between

10  what users was this conversation?

11      A    This is another conversation between Argonaut

12  and CWK.  This particular conversation was on

13  September 6th of 2014.  The initial message is Argonaut

14  sending a message to CWK complaining about a particular

15  user on the site.

16      Q    What user was Argonaut complaining about?

17      A    The user Skee who was the head administrator.

18      Q    There's a sentence in the second page of the

19  message from Argonaut that says, "I think he's LE--"

20  sorry.  "I've PM'd Skee that I think he's LEA, acting

21  like a moron."  What does "LEA" stand for in context?

22      A    "LEA" stands for "law enforcement agency."

23      Q    And what was the complaint that Argonaut was

24  raising?

25      A    That Skee was conducting certain activities on

1    the site that made him nervous and made him think that

2    Skee was actually law enforcement.

3         Q    In the third line from the bottom of that first

4    paragraph message from Argonaut, he makes a statement

5    about "It's why we remove YouTube links and PDF files."

6    What is that a reference to?

7         A    That, again, is another reference to certain

8    sites or downloads that they consider to be unsafe just

9    due to the potential that identifying information

10   associated with your computer could be exposed.

11        Q    Showing you Government's Exhibit 17A, between

12   what two users was this conversation?

13        A    So this is a conversation between Argonaut and

14   Amalfi that was conducted on April 23rd of 2014.  This

15   message is sent from Argonaut to Amalfi, initially

16   stating how he can let someone into the PZ, which here

17   refers to the Producer Zone, Private Zone, with an

18   approved application.

19        Q    Was Amalfi another co-administrator of the

20   site?

21        A    Yes.

22        Q    And without having to go through all the text,

23   did Amalfi answer Argonaut's question about how to let

24   someone into the PZ, or Private Zone?

25        A    Yes.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1      Q    Can you just remind us what sort of information

2  or content was contained in that Private Zone?

3      A    That was the, the producer content that was --

4  only other producers are allowed access to that.  And

5  "producers" in this context was, referred to users who

6  had access to children, who produced images or video

7  depictions of that child engaging in some sort of

8  sexually explicit conduct.

9      Q    Showing you Government's Exhibit 17B, between

10 what two users was this conversation?

11     A    This is another conversation between Argonaut

12 and Amalfi.  This particular one was conducted on

13 February 27th of 2014.

14     Q    At the top of the conversation, is this another

15 sort of forwarded piece of information from Argonaut to

16 Amalfi?

17     A    Yes.

18     Q    And what did -- what did Argonaut indicate

19 after that forwarded information about the user they were

20 discussing?

21     A    He's stating here that this particular user no

22 longer has access to that Private Zone since we think --

23 meaning the administrative team -- he leaked every single

24 post over on H2TC.

25     Q    So what does it mean to "leak a post"?

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1        A     So users who had access to those private areas,

2    the producer section of the site, were required to not

3    post any of that material anywhere else.  If they did, if

4    they posted it to another board, if they sent it to

5    another user, if they posted it anywhere else on TLZ, it

6    was -- that's what they referred to as a leak.  And then

7    they would remove that person's access from the Producer

8    Zone.

9        Q     And why was that?  What was the reason for

10   that?

11       A     It was partially to maintain just that

12   exclusive material in that particular section.  It was

13   also for what they deemed security reasons to prevent

14   possible -- or the potential for the actual producer's

15   identity to be exposed if that material was provided to

16   the general TLZ or other website population.

17       Q     And what is "H2TC"?

18       A     That was another hidden service that was fairly

19   well known that was dedicated to child pornography.  The

20   "H2TC" stood for "hurt to the core."  It is a form of

21   child pornography that combines child pornography with,

22   with hurtcore or bondage, torture, and those sorts of

23   things.

24       Q     Showing you Government's Exhibit 18.  Now,

25   first, is this a private message conversation or a

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    different type of message that we're seeing on

2    Government's 18?

3        A    This is postings to the board that were

4    conducted between the administrators and the

5    administrator section of the website.

6        Q    So not -- rather than private messages, these

7    were accessible to some users?

8        A    Correct.

9        Q    And what users would these sorts of postings

10   been accessible to?

11       A    Generally just the administrative team.

12       Q    Drawing your attention to the last message on

13   Exhibit 18, what does Argonaut indicate about a role that

14   he had assumed and as of what date?

15       A    So the date that Argonaut replied was April

16   13th of 2014 in which he states, "I have taken over the

17   role of doing VIP upgrades, so you can send them my way

18   if you get any."

19       Q    Special Agent O'Donnell, showing you

20   Government's Exhibit 19A, did you find postings where the

21   user Argonaut expressed views about child pornography

22   laws?

23       A    Yes.

24       Q    And what do we see depicted on Government's

25   Exhibit -- well, first of all, where on the website was

1   this particular posting that we see in 19A?

2       A    This was in the Discussion Board section of the

3   site that was open to all members of the site that

4   contained a variety of different topics.

5       Q    And what was the, the particular thread that

6   Argonaut posted a message called?

7       A    This particular thread was the Laws regarding

8   child pornography throughout the world."

9       Q    When was this post made?

10      A    This was made on February 3rd of 2014.

11      Q    And then there's two paragraphs in the content

12  of this.  Can you explain just generally what, the

13  context of those two paragraphs?

14      A    The first paragraph was a quote or a previous

15  post made by another user that Argonaut singled out and

16  was replying to specifically here.

17      Q    And what was Argonaut's, what was Argonaut's

18  posting about this particular issue?

19      A    Argonaut's stating here -- he's talking about

20  the law.  "Remember what I said about selective

21  application of the law is the root of all the problems?

22  Again, here it is, demonstrated very clearly.  You have

23  the freedom of thought and expression until -- except

24  when it comes to these things which we don't like.  It's

25  unconstitutional."

1         So he's stating here that, that he disagrees

2    with the fact that this would be considered illegal.

3         Q    And what does he continue to state after

4    unconstitutional?

5         A    "The Bill of Rights supersedes any of this

6    other unconstitutional bullshit they've tried to add on

7    after the fact.  Look above.  It clearly protects one

8    type of pornography but only if it does not involve

9    children.  I also don't have the freedom to threaten that

10   I will defend myself against such tyranny if you try to

11   take my rights away.  What?"

12        Q    Showing you Government's 19B, in what Love Zone

13   forum and thread were these postings contained?

14        A    This, again, was in the Discussion Board

15   section of the site.  The particular thread in this case

16   was "Perverted Basement Dwelling Virgin Losers."

17        Q    And what was the, the content of the, the

18   initial post by the user CWK, the general topic of it?

19        A    The general topic here is how pedophiles

20   generally are depicted in social settings or in the mass

21   media.

22        Q    What question did CWK ask other users in that

23   post?

24        A    He's asking a variety of questions here,

25   including:  Have you ever had sex with an actual man or

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   woman?  What is your view on the stereotype of

2   interacting with children?  And do you think it describes

3   people in this community?

4        Q    Did Argonaut reply to, within this thread?

5        A    He did.

6        Q    And in the second full paragraph what did Arg--

7   what did Argonaut generally state on February 5th of

8   2014?

9        A    He's describing his particular opinion here of

10  how he feels about children versus adults.

11       Q    In the second paragraph response, what does

12  Argonaut indicate in terms of the wrongfulness of sex

13  between adults and children?

14       A    So the first sentence here states, "I've always

15  thought about why someone would need to kill a child

16  (after having sex with them) in the past and always come

17  to the conclusion that, if it was legal, this wouldn't be

18  necessary.  I would never hurt a child.  People want what

19  they want.  If it's to have sex with children, who are we

20  to say it's wrong?  As long as nobody's getting hurt,

21  people should mind their own business about what other

22  people like and don't like."

23       Q    Showing you Government's Exhibit 19C, in what,

24  what particular forum was this contained and what thread?

25       A    This was in the News Articles forum, which

1   again was accessible to any full member of the site.  The

2   particular thread is "International kiddie porn editor

3   pleads guilty."

4        Q    And did Argonaut reply within that thread

5   discussing a guilty plea of a child pornography case?

6        A    Yes.

7        Q    What was his general comment about that?

8        A    Just that it was stupid to plead guilty.

9        Q    Showing you Government's Exhibit 19D, what Love

10  Zone forum was this thread contained?

11       A    This particular post was in the Announcements

12  and Information section, which, again, was available to

13  all full members of the site.  The title of the thread

14  was "CP Possession Laws Around The World," in this case,

15  "CP" standing for child pornography.

16       Q    And what did Argonaut comment on in his posting

17  within that thread about child pornography possession

18  laws around the world?

19       A    So the first sentence here, he states, "So the

20  FH guy does something illegal, like knowingly hosting

21  CP."  He's talking about the fact of law enforcement

22  taking down child pornography sites.

23       Q    Showing you Government's 19E, did Argonaut also

24  make postings where he gave advice to other users about

25  things like computer security or encryption?

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1        A     Yes.

 2        Q     The posting in 19E, in what forum was this

 3   posting?

 4        A     This was in the Safety and Tech Questions

 5   section of the site, which, again, was open to all full

 6   members of the website.

 7        Q     And what sort of information was found in the

 8   Safety and Tech Questions part of the website?

 9        A     In this case, he's responding to a, a question

10   from another user about how to make a particular program

11   leave less traces on your computer should law enforcement

12   actually come across it.

13        Q     And the thread title is "WinRar Security."

14   What's "WinRar"?

15        A     This is one of the software programs that can

16   be utilized to read and access those RAR compressed

17   files.

18        Q     Those are those, those encrypted folders that

19   users were required to put the images and videos into

20   when they shared them?

21        A     Correct.  And then those folders were

22   password-protected.

23        Q     Showing you Government's 19F, what site forum

24   and thread were these messages in?

25        A     This was in the Announcements and Information
```

```
 1   section, again, open to any full member of the site.  The
 2   thread was "TrueCrypt Encryption Software Stumps
 3   Detectives."
 4        Q    Are you familiar with what TrueCrypt encryption
 5   is?
 6        A    Yes.
 7        Q    What is it generally?
 8        A    It's a free encryption software that has a few
 9   different features, but primarily is used to encrypt
10   portions of your hard drive or individual files.
11        Q    And in the second paragraph under the reply by
12   Argonaut, what comment did he give about three lines down
13   regarding a use of encryption by -- well, first, let's
14   go -- what's the general context in this, in this posting
15   thread?  What was being discussed?
16        A    In this case, the discussion was about a
17   particular case involving a different individual who was
18   distributing child pornography online, and that a search
19   warrant was served at his, his house.  Argonaut is
20   replying to that with his opinion of what might have
21   happened or what could be done.
22        Q    What comment did Argonaut offer on the third
23   line down about the user's encryption?
24        A    He states here, "Good move by him not to give
25   up on his encryption."
```

1      Q      What would that mean?  What would it mean to

2    "give up" on a user's encryption?

3      A      What he's saying here is it was a good move by

4    the particular individual not to give up his encryption

5    keys or password to law enforcement so that law

6    enforcement would be unable to access those files and

7    determine the content.

8      Q      Showing you Government's 19G, what -- what

9    site, forum, and thread do we see here?

10     A      This is in the Safety and Tech Questions forum

11   again, with the thread "Storing CP Files" -- again, "CP"

12   being short for child pornography.

13     Q      And did Argonaut make a particular posting

14   within that thread about storing CP files?

15     A      Yes.

16     Q      Without going through the minutia, what was the

17   general content of this particular post?

18     A      In general, he's describing how CP files could

19   be safely stored and how evidence of that could

20   potentially be removed or deleted so that law enforcement

21   would be unable to detect it.

22     Q      All right.  Let's shift gears slightly, Special

23   Agent O'Donnell.  I want to ask you about a couple of

24   other administrator or co-administrators of The Love

25   Zone.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1                  Showing you Exhibit 1L, what's depicted in
 2     Exhibit 1L?
 3          A     This is a profile of another co-administrator.
 4     In this case, the profile is of the co-administrator
 5     Amalfi.
 6          Q     Was Amalfi identified during the course of this
 7     investigation?
 8          A     Yes.
 9          Q     Who was he, and where did he live?
10          A     David Delalio, in Longmont, Colorado.
11          Q     Showing you Exhibit 1M, whose profile is that?
12          A     This is the profile of the user CWK who was
13     also a co-administrator on the site.
14          Q     Was CWK identified during the course of this
15     investigation?
16          A     Yes.
17          Q     Who was he, and where was he?
18          A     Andrew Hoff in San Antonio, Texas.
19          Q     Showing you Exhibit 1N, whose profile does that
20     depict?
21          A     This is the profile of the user Neo, who was
22     also a co-administrator on the site.
23          Q     Was Neo identified during the course of the
24     investigation?
25          A     Yes.
```

1      Q      Who was he, and where was he?

2      A      Brian Davis, in Farmer City, Illinois.

3      Q      Special Agent O'Donnell, was the FBI able to

4   obtain IP address information related to the activity of

5   the user Argonaut?

6      A      Yes.

7             MR. BECKER:  Your Honor, at this time we'd ask

8   the Court to enter and read Stipulation Number 5.

9             THE COURT:  Number 5.  Ladies and gentlemen,

10  the parties stipulate and agree that, if called to

11  testify, a custodian of records from Time Warner Cable,

12  headquartered in Herndon, Virginia, would testify that

13  the documents presented in Government's Exhibit 21 are

14  true and accurate copies of business records made at or

15  near the time the information was transmitted to a person

16  with knowledge and kept in the course of regularly

17  conducted business activity.  These records were provided

18  to the government in response to a subpoena.

19            Mr. Becker, at this time, do you wish to move

20  to admit Government's Exhibit 21?

21            MR. BECKER:  Yes, Your Honor.

22            THE COURT:  It is admitted by stipulation.

23  BY MR. BECKER:

24     Q      Special Agent O'Donnell, handing you

25  Government's Exhibit 21.  Regarding the IP address

1  information that was related to the user Argonaut, who

2  did Time Warner indicate was the subscriber of the

3  Internet account at the pertinent address?

4      A    Jason Gmoser.

5      Q    And what was that address?

6      A    2000 Smith Road, Hamilton, Ohio, 45013.

7      Q    Was that information ultimately sent to FBI in

8  the Ohio area in order to further the investigation?

9      A    Yes.

10         MR. BECKER:  Your Honor, for the record, just a

11  housekeeping matter, Stipulation Number 2 we do have

12  designated as Government's Exhibit 20B; Stipulation

13  Number 3, Government's Exhibit 20C; and Stipulation

14  Number 5, Government's Exhibit's Exhibit 20E.

15         THE COURT:  Got it.

16         MR. BECKER:  I have no further questions at

17  this time.

18         THE COURT:  All right.  Mr. Kraemer, before you

19  start your cross -- ladies and gentlemen, we take one

20  break in the morning and one break in the afternoon.

21  Normally I would wait about ten minutes, but I don't want

22  to interrupt Mr. Kraemer's cross-examination; so let's

23  take our break now for about ten minutes, a little more

24  than ten minutes.

25         Come back at -- we'll be back in here about

1  10:35.  That will be our only break for the morning.

2  Then we'll just go through until lunch.  All right?

3              (Jury absent, 10:22 a.m.)

4          THE COURT:  Take a break until 10:35.

5              (Recess, 10:23 a.m. to 10:37 a.m.)

6          THE COURT:  Mrs. Peirson, any reason not to

7  bring the jury back in?

8          MS. PEIRSON:  No, Your Honor.  We're ready.

9          MR. KRAEMER:  No, sir.

10          THE COURT:  Let's bring them back.

11              (Brief pause in proceedings.)

12              (Jury present, 10:38 a.m.)

13          THE COURT:  Mr. Kraemer, --

14          MR. KRAEMER:  Thank you, Your Honor.

15          THE COURT:  -- whenever you're ready.

16          CROSS-EXAMINATION BY MR. KRAEMER:

17      Q    Special Agent O'Donnell, we've met?

18      A    Yes.

19      Q    Okay.  I just have a few questions for you.  I

20  appreciate the knowledge that you brought us today, but

21  I'm going to need you to dumb some of it down for me, --

22      A    Sure.

23      Q    -- okay?

24          Yesterday you testified that if someone wanted

25  to access the Tor network that that was relatively a

1   simple process, correct?

2        A    If you knew where to go to find the, the Tor

3   browser, yes.

4        Q    Okay.  So any Tom, Dick, or Harry that's given

5   the knowledge of, hey, download the -- I believe you

6   called it The Onion Bundle?

7        A    The Tor Browser Bundle.

8        Q    The Tor Browser Bundle -- can download and have

9   access to the Tor network, correct?

10       A    That's correct.

11       Q    Okay.  Once on there, they would need to

12  find -- I believe you called it The Hidden Wiki?

13       A    It would be one way of, of finding information

14  under the Tor hidden services.

15       Q    Okay.  They could do a search The Hidden Wiki

16  and find TLZ or The Love Zone?

17       A    On the specific Hard Candy hidden service that

18  was dedicated to -- Tor hidden services for child

19  pornography, yes.

20       Q    Okay.  I'm going to ask you a couple basic

21  questions about Tor.  Yesterday you talked about Tor; and

22  you said, well, if you wanted to maintain security, that

23  Tor would be something you could use, correct?

24       A    Yes.

25       Q    Okay.  Tor would also serve to provide you with

```
 1    anonymity from anyone, correct?  Not just law
 2    enforcement?
 3         A    It was designed to allow for anonymous
 4    communications between computers.  Yes.
 5         Q    So if someone didn't feel comfortable putting
 6    out their personal life, personal details, or anything
 7    like that, Tor is the way to guard that from anyone on
 8    the Internet, correct?
 9         A    Yes.
10         Q    Okay.  Now, we talked a lot yesterday about the
11    opening screens to when you get to TLZ.
12         A    Yes.
13         Q    Okay.  Do you remember that?
14         A    Yes.
15         Q    Okay.  One of the screens that you pointed to
16    said:  These are the rules for someone to post on TLZ,
17    correct?
18         A    Correct.
19         Q    Okay.  Now, you testified that these rules
20    could be for safety, correct?
21         A    The -- yes.  The safety of the users accessing
22    the site, correct.
23         Q    Okay.  Now, if you wanted to stay a member of
24    TLZ, you had to post according to those rules, correct?
25         A    Correct.
```

```
 1        Q     Okay.  So if you didn't encrypt, you didn't

 2   contribute once every 30 days, you didn't post using the

 3   format that they approved, you were kicked off the site,

 4   correct?

 5        A     In general, that's how it worked.  Yes.

 6        Q     That was the concept?

 7        A     Yes.

 8        Q     Okay.  So if someone had to see that material,

 9   if someone had to have that material in their life, they

10   had to follow the rules of the site?

11        A     Correct.

12        Q     Okay.  You talked about the one forum; you

13   talked about the application page?

14        A     Yes.

15        Q     Okay.  And I believe you testified yesterday

16   that there were approximately 14,000 application posts at

17   the time that you took your screen shot?

18        A     I believe there were 47,000 actual application

19   posts.

20        Q     Okay.  So 47,000.  I'm sorry.

21              To go through each and every one of those

22   posts, to decide whether or not they met all of the

23   criteria, it's fair to say that's a lot of work, right?

24        A     I would think so.  Yes.

25        Q     Time-consuming?
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1        A     Yes.

 2        Q     Got to have somebody in that position to do

 3   that that's got a lot of free time on their hands?

 4        A     And it was typically done by multiple members

 5   of the administrative team; but, yes.

 6        Q     Okay.  But the administrative team that you

 7   showed us yesterday, there were only -- what? -- five or

 8   six guys on it, in that co-admin group?

 9        A     In the co-administrator section, I believe

10   there were eight.

11        Q     Okay.  So eight guys, 47,000 posts, and I

12   believe there was something on there that said that these

13   needed to be approved in about a two- to three-day

14   window, or that that was the goal?

15        A     That was the goal, I believe.  Yes.

16        Q     Okay.  So we're talking -- what? -- about 6,000

17   posts a guy if everybody carried their weight equally in

18   about a two-day time span?

19        A     Well, including the other administrators as

20   well.  There were four other administrators, plus the

21   head administrator, and I do believe there were different

22   administrators at different times throughout the board's

23   history.

24        Q     Okay.  So you --

25        A     So I don't have an exact number on the total
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1  who --

2       Q    Okay.

3       A    -- were responsible.

4       Q    And I don't expect you to.  I'm sorry.  I

5  shouldn't ask anybody to do math.

6            But that's assuming that everybody would carry

7  their weight equally, right?

8       A    Correct, yes.

9       Q    Okay.  Now, do you still have -- you still have

10 the paper exhibits in front of you?

11      A    I do not.

12      Q    Okay.

13           MR. KRAEMER:  Your Honor, may I approach the

14 witness?

15           THE COURT:  You may.

16           MR. KRAEMER:  I'll give you this for reference.

17 BY MR. KRAEMER:

18      Q    Now, I've handed you the exhibits that Mr.

19 Becker just went over with you, Exhibits 15 through 19;

20 is that --

21      A    Yes.

22      Q    -- fair?

23      A    Yes.

24      Q    Okay.  Now, there seem to be three primary

25 subject areas on The Love Zone:  child pornography,

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    computer security, and then their views on law

2    enforcement.

3         A    In general, those were three main topics.  Yes.

4         Q    I mean, those seem to be the things that

5    everybody wanted to talk about, right?

6         A    Correct.

7         Q    Okay.  If I wanted to learn how to encrypt

8    something, I can find that on The Love Zone, can't I?

9         A    Yes.  There were tutorials on how to do that.

10        Q    If I went to The Love Zone tutorials, they

11   would tell me exactly how to encrypt everything?

12        A    Yes, depending -- not all types of encryption,

13   but certain examples of encryption, yes.

14        Q    Enough certainly to get by to survive on the

15   board?

16        A    Yes.

17        Q    Okay.  If you could look at Exhibit 19A for me,

18   that was a -- I believe you called it a private message,

19   or essentially an email, between Argonaut and the forum

20   or Discussion Board?

21        A    19A was an actual post to the Discussion Board

22   section of the site.  So it wasn't a private message.

23   This -- it was a post that was available in that thread

24   that was accessible by all of the, the full members of

25   the site.

1    Q    Okay.  Now, correct me if I'm wrong, but

2  yesterday we spoke about The Love Zone held itself out as

3  wanting to have a community feel.

4    A    Correct.

5    Q    Okay.  And if you wanted to fit in and you

6  wanted to be part of the community, you had to be fluent

7  in the topics of child pornography, Internet security,

8  and view on law enforcement?

9    A    At least to follow their rules, yes.

10   Q    Okay.  So this post, 19A, if I went to The Love

11 Zone, I could find hundreds, maybe even thousands, of

12 other messages in this same vein, couldn't I?

13   A    Again, I wouldn't know the exact number, but

14 there, there would have been a multitude of messages on

15 various topics similar to this.

16   Q    So this message by Argonaut about

17 constitutionality is by no means unique?

18   A    I wouldn't say so.  No.

19   Q    Okay.  Go to 19B for me.

20        And, Mr. Becker, if you could please pull up

21 19B for me.

22        This is another post on that same Discussion

23 Board originally posted by CWK, correct?

24   A    Correct.  So the original post was made by CWK

25 to that specific section, and then other users replied to

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1   that post.
 2        Q    Okay.  And we're talking about whether or not
 3   anyone has had any kind of sex with an actual man or a
 4   woman, --
 5        A    Correct.
 6        Q    -- correct?
 7        A    That's one of the topics in here.  Yes.
 8        Q    Okay.  And then I guess on the general
 9   stereotype that people that, I guess, participate on The
10   Love Zone are -- let me make sure I get the term right --
11   perverted basement dwelling virgin losers.
12        A    That's the title of the topic.  Yes.
13        Q    I'm not sure that's a technical term, but
14   that's at least what he calls it?
15        A    Correct.
16        Q    Okay.  In the reply by Argonaut, he says, "I
17   thought you were talking about me for a minute."  Right?
18        A    Correct.
19        Q    And that's referring to him being a perverted
20   basement dwelling virgin loser, correct?
21        A    That appears to be what he's responding to.
22   Yes.
23        Q    Okay.  And the second reply, earlier you read
24   most of the second paragraph, but you didn't read the
25   last line.  And I would just ask you if you could read
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    that last line for me?

2         A    In the second paragraph?

3         Q    In the second reply.

4         A    The second reply.  The last two lines?

5         Q    Yes, sir.

6         A    "But you have no right telling consenting

7    parties they can't do whatever they're doing, unless

8    maybe we're doing it in your living room."

9         Q    Okay.  Now, in reading that, when we're talking

10   about consenting parties, we're talking about an adult

11   and a child, correct?

12        A    I -- my interpretation of this particular post

13   is that he's -- this is referring to anybody of any age

14   that's engaging in these activities.  I don't believe

15   that there is an age range given here.  So I don't think

16   that this is specifically isolated to adults, that this

17   would include adults and children.

18        Q    Okay.  So what you're saying is, if I

19   understand you correctly, that this would include

20   consenting parties, meaning adults, children, or anybody

21   in between?

22        A    I believe so.  Yes.

23        Q    Okay.  And that would seem to convey the idea

24   that Argonaut feels that children are capable of giving

25   consent?

```
 1        A    In my experience, many users of this site and

 2   other child pornography websites felt that same way as

 3   well.

 4        Q    Is that normal?

 5        A    Define --

 6        Q    To you and me, is that normal?

 7        A    I would say, for me, no.

 8        Q    Okay.  I'm going to say no.  I'm married.

 9             But that just seems a little bit off the

10   reservation, doesn't it?

11        A    It does, as does child pornography in general.

12        Q    Okay.  I want you to go to Exhibit 19C for me.

13             This is another post about -- well, I guess

14   this one's in a News Article forum talking about an

15   international kiddie porn editor pleads guilty, correct?

16        A    Yes.

17        Q    Okay.  And it doesn't appear that this is his

18   post?

19        A    The, the first sentence where it states the

20   cited quote, that's a quote that was -- he had copied

21   into his post, but that particular section was posted by

22   another user.

23        Q    Okay.  So he's making a reply to someone else's

24   commentary on this?

25        A    That's correct.  Yes.
```

1    Q    This isn't his original thought?

2    A    No.  That part is, was posted by somebody else.

3    Q    Okay.  Go to 19D for me.  This one is in the

4  forum Announcements and Information; but, again, this

5  seems like a reply by Argonaut to another post, correct?

6    A    Correct.

7         THE COURT:  Mr. Kraemer, do you want us to see

8  these?

9         MR. KRAEMER:  No, that's okay.

10         THE COURT:  Okay.

11  BY MR. KRAEMER:

12    Q    He offers a commentary in here that law

13  enforcement hacked a server, correct?

14    A    Yes.

15    Q    Okay.  You have the ability to investigate,

16  correct?

17    A    Yes.

18    Q    His comprehension of what happened here is not

19  an accurate assessment of what your abilities of law

20  enforcement are, is it?

21    A    This particular statement was not accurate in,

22  in terms of that, that investigation.

23    Q    Okay.  There are several comments made by

24  Argonaut in the vein of "shouldn't cooperate with law

25  enforcement," correct?

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1        A    Yes.

 2        Q    Okay.  You have come to know through your

 3   knowledge of this investigation that Argonaut did,

 4   indeed, cooperate with the investigation, didn't he?

 5        A    Yes.  He agreed to be interviewed on scene.  I

 6   wasn't present for that.

 7        Q    Okay.  You came to be aware that he turned over

 8   his encryption passwords, correct?

 9             MR. BECKER:  Objection to scope.

10             THE COURT:  I'll sustain -- I'll sustain --

11   rephrase that question.

12             MR. KRAEMER:  Okay.

13   BY MR. KRAEMER:

14        Q    One of the other quotes that you talked about

15   said that someone shouldn't give up their encryption

16   passwords.

17        A    That's correct.

18        Q    Okay.  You have come know, though, that

19   Argonaut gave up his encryption password, didn't he?

20        A    I believe he did.  Yes.

21        Q    Okay.  And you stated that he cooperated and

22   gave an interview with law enforcement, correct?

23        A    Yes.

24        Q    Okay.  He actually spoke to two other agents?

25        A    That's correct.
```

1    Q    Okay.  If I look on The Love Zone and I look at

2  the security and the law enforcement articles and

3  everything, would they tell me to do any of those things?

4    A    No.

5    Q    In fact, they would tell me "Don't talk to law

6  enforcement," right?

7    A    Correct.

8    Q    "Don't give up your passwords"?

9    A    Yes.

10    Q    And not only did he do that -- I'm going to

11  strike that.  Let me rephrase.

12         He basically ignored all of the things that

13  someone's told to do on this website, correct?

14    A    As far as those specific topics, he didn't

15  follow those in that instance.  No.

16         MR. KRAEMER:  I don't believe I have any other

17  questions for Agent O'Donnell at this time, Your Honor.

18         THE COURT:  Mr. Becker, any redirect?  You can

19  take your time.

20         MR. BECKER:  Thank you, Your Honor.

21          REDIRECT EXAMINATION BY MR. BECKER:

22    Q    Special Agent O'Donnell, you were asked some

23  questions on cross-examination about what users had to do

24  in order to continue to have access to the website and be

25  a full member.  They had to contribute; is that right?

1       A    That's correct.

2       Q    Were users required to advance up to the level

3  of administrator in order to continue to get access to

4  the site?

5       A    No.  The simple requirement for maintaining

6  your full membership was the one approved contribution

7  post per month.

8       Q    You were asked some questions about the,

9  approving application posts on the site.  And there was a

10 number on one of those exhibits that was about 47,000

11 applications posts.  Do you recall that?

12      A    Yes.

13      Q    Were those -- did that refer to 47,000 posts

14 that were waiting for approval at that period of time or

15 something else?

16      A    No.  That was the total number of application

17 posts that had been made since the site began operating,

18 or at least began keeping track.

19      Q    Which was how many years at least before the

20 date of that screen shot that we saw?

21      A    About, approximately four years.

22      Q    Was it one person or more than one person who

23 had to approve those membership posts to let people in to

24 TLZ?

25      A    It was more than one person.  It was a

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    responsibility that was shared by various members of the

2    administrative team.

3        Q    Would it have been an unusual view for a user

4    of TLZ to take a position that sex with children should

5    be allowed?

6        A    No.  That was typical.

7        Q    You were asked some questions about one of the

8    postings we saw earlier where there was a reference to

9    whether law enforcement "hacked a server."  Do you recall

10   that?

11       A    Yes.

12       Q    And you were asked on cross-examination whether

13   Argonaut was correct in that view.  First, was that a

14   reference to an actual investigation by law enforcement?

15       A    Yes, it was.

16       Q    Was there media coverage about that

17   investigation?

18       A    Yes.

19       Q    There was a term "FH" used in that posting.

20   What did that term refer to?

21       A    That referred to Freedom Hosting.

22       Q    And did that -- was that -- has it been

23   reported that Freedom Hosting, or FH, was the subject of

24   a law enforcement investigation?

25       A    Yes.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1      Q      Would it be correct to say that Argonaut was

2  wrong in terms of there having been an investigation into

3  Freedom Hosting?

4      A      No.  As far as the actual, the investigation,

5  he was correct.

6      Q      What was he wrong about?

7      A      He was wrong about the hacking of the server.

8      Q      I.e., FBI did not hack a Freedom Hosting

9  server?

10     A      That's correct.

11            MR. BECKER:  I have no further questions.

12  Thank you, Your Honor.

13            THE COURT:  Recross.

14            MR. KRAEMER:  I have just a few questions.

15             RECROSS-EXAMINATION BY MR. KRAEMER:

16     Q      You stated that you didn't have to -- you

17  didn't have to advance on the website, correct?

18     A      Correct.

19     Q      You didn't have to seek promotion?

20     A      No.

21     Q      Okay.  If one wanted to gain, for lack of a

22  better word, prestige or notoriety, did that come with

23  advancement?

24     A      It could.  Yes.

25     Q      Okay.  Did it seem that the admins or co-admins

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   were treated, maybe, a little bit better than the regular

2   full members?

3        A    I don't know if I would say better.  They were

4   referenced as far as having to settle disputes, and they

5   were -- they were the individuals that other users were

6   directed to point any questions or disputes to.

7        Q    You stated that there were several people that

8   could approve posts, correct?

9        A    That's correct.

10       Q    Okay.  But there's no way to know, or you don't

11  know the exact numbers of how much each administrator

12  approved, correct?

13       A    I don't know that.  No.

14       Q    Okay.  And there's nothing to indicate that

15  each of them were given a select amount, or it was

16  equally doled out to each administrator, correct?

17       A    Not to my knowledge, no.

18       Q    Okay.  If someone was approving these posts,

19  because of the bulk amount of these posts, would one

20  method be to download all of those posts and then go

21  through them?

22       A    I don't know how they actually went through the

23  approval process, if different administrators had

24  different methods of viewing it.

25       Q    Okay.  I guess what I'm asking you -- I mean,

1   you're the computer expert -- is that a possible method?

2        A    They could have gone in and downloaded the

3   individual files.  Yes.

4        Q    Okay.  So you could download a bulk amount of

5   files to perform your job as administrator of, you know,

6   approving each post, correct?

7        A    Yes.

8             MR. KRAEMER:  Okay.  I don't believe I have

9   anything further, Your Honor.

10            THE COURT:  Mr. Becker, any --

11            MR. BECKER:  No, Your Honor.

12            THE COURT:  -- redirect?  No.

13            You may step down.

14                (Witness O'Donnell excused, 11:02 a.m.)

15            THE COURT:  Mrs. Peirson, Mr. Becker, you may

16   call your next.

17            MR. BECKER:  Thank you, Your Honor.  The

18   government calls Special Agent Daniel Johns.

19                (Brief pause in proceedings.)

20             DANIEL JOHNS, sworn, 11:03 a.m.,

21             DIRECT EXAMINATION BY MR. BECKER:

22        Q    Good morning, Agent Johns.

23        A    Good morning.

24        Q    If you can start by stating and spelling your

25   full name for the record, please?

```
 1        A    Yes.  It's Daniel Johns, J-o-h-n-s.

 2        Q    What do you do for living?

 3        A    I am a special agent with the FBI.

 4        Q    For how long have you been with the FBI?

 5        A    Approximately eight and a half years.

 6        Q    What is your current assignment?

 7        A    I am assigned to the Major Case Coordination

 8   Unit, which is within the Violent Crimes Against Children

 9   section.

10        Q    What are your current responsibilities in the

11   Major Case Coordination Unit?

12        A    I investigate child exploitation matters that

13   occur on the Internet, whether they be through websites

14   or peer-to-peer programs.

15        Q    For how long have you been in that unit?

16        A    For about a year and a half.

17        Q    What other roles have you held within the FBI?

18        A    So for approximately five years, I worked

19   International Terrorism within the Miami Division.  After

20   that, I worked approximately two years of Violent Crimes

21   Against Children, specifically within the Miami Division,

22   until I transferred to the Major Case Coordination Unit.

23        Q    Do you do online undercover work in connection

24   with your investigations?

25        A    I do.
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    Q    Have you had training on those

2    responsibilities?

3    A    I have.

4    Q    What sort of training?

5    A    I've had online covert employee training, both

6    within the realm of counter-terrorism and within the

7    realm of violent crimes against children.

8    Q    Do you have an educational background related

9    to information technology?

10   A    Yes.  I have a bachelor's of science in

11   information technology.

12   Q    Special Agent Johns, did you participate in the

13   investigation of The Love Zone, or TLZ?

14   A    I did.

15   Q    Have you particularly participated in the

16   investigation of the user named Argonaut?

17   A    I did.

18   Q    What sort of roles did you play within the

19   investigation?

20   A    Primarily to document criminal activity that

21   was occurring on the hidden service The Love Zone, or

22   TLZ, and to conduct undercover communications with users

23   on that website.

24   Q    Did that include undercover communication with

25   the user Argonaut?

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1        A    It did.

 2        Q    I'm handing you Government's Exhibits 3A

 3   through 3E inclusive.  Please review them and then let us

 4   know if you recognize them.

 5        A    I do recognize them.

 6        Q    What do you recognize them to be?

 7        A    These are screen captures of undercover

 8   recordings that I made on The Love Zone.

 9        Q    Are those from the date October 1st of 2014?

10        A    They are.

11        Q    Are they fair and accurate copies of screen

12   shots of your undercover machine while you accessed the

13   website on October 1st of 2014?

14        A    They are.

15             MR. BECKER:  Your Honor, we'd move to admit

16   Government's 3A through 3E inclusive.

17             MR. KRAEMER:  No objection, sir.

18             THE COURT:  3A through 3E are admitted.

19   BY MR. BECKER:

20        Q    Special Agent Johns, have you reviewed digital

21   copies of Exhibits 3A through 3E on the trial laptop in

22   front of me?

23        A    I have.

24        Q    Are they fair and accurate digital copies of

25   Exhibits 3A through 3E?
```

1        A      They are.

2                MR. BECKER:  Your Honor, permission to publish

3    3A through 3E digitally?

4                THE COURT:  You may publish to the jury at this

5    time.

6    BY MR. BECKER:

7        Q      Before we get to that, Special Agent Johns,

8    what TLZ account were you using when you documented this

9    site on October 1st of 2014?

10       A      I was using the co-admin account CWK.

11       Q      And how is it that you came to be using the

12   account of CWK?

13       A      That was provided to law enforcement

14   voluntarily as an account takeover on the date of CWK, or

15   Andrew Hoff's arrest.

16       Q      Now, when you're communicating or taking over

17   an account like that, do you, do you actually communicate

18   with other users; i.e., send or receive messages?

19       A      Yes.  That's correct.

20       Q      Do you post any images or videos related to

21   child pornography?

22       A      Absolutely not.

23       Q      Let's start with Exhibit 3D.  First, if you can

24   review that, does that contain postings by Argonaut that

25   include contact sheets?

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1         A     It does.

 2         Q     Showing you Exhibit 3D, in the top left of the

 3   exhibit, who posted this message?

 4         A     That was posted by Argonaut on May 17, 2014.

 5         Q     What was the title of the posting?

 6         A     "Nino deli."

 7         Q     Was the posting approved?

 8         A     It was.

 9         Q     And how was it categorized by the site?

10         A     It was categorized as "all preteen, early teen,

11   hard, soft, modeling, nudist or webcam."

12         Q     Was there any text to accompany the post?

13         A     There was.

14         Q     What did it consist of?

15         A     The file name, which was "21847.mp4."

16         Q     And when you see a file name like ".mp4," what

17   does that mean?

18         A     That indicates that it's a video file.

19         Q     Did the post include a contact sheet of images

20   from that video file?

21         A     It did.

22         Q     Do you see those on Government's 3D?

23         A     I do.

24         Q     Please describe them for the record.

25         A     It's what appears to be an infant or toddler,
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1  male child, with an adult hand touching the male child's

2  penis.

3       Q    On the second page of Government's 3D in the

4  bottom portion, did Argonaut include a location where the

5  video could be downloaded?

6       A    He did.

7       Q    And what about a password?

8       A    Yes.  That also is contained in there as well.

9       Q    Did any user respond to Argonaut's posting?

10      A    Yes.  The user Matrix replied with, "Thanks,

11  Argonaut."

12      Q    Showing you Government Exhibit 3E, do you

13  recognize 3E?

14      A    I do.

15      Q    This is a posting by what user?

16      A    This is a posting by the user Argonaut on March

17  27, 2014.

18      Q    The title of the posting?

19      A    "Sponge Bob."

20      Q    Does the word "Sponge Bob" have any

21  significance to child pornography?

22      A    It does.

23      Q    What is that?

24      A    Sponge Bob is a known series of a child -- a

25  known series of child pornography of a child that has

1    been identified previously.

2        Q    And how are you aware that the child has been

3    identified?

4        A    So when the FBI or any law enforcement agency

5    conducts investigations regarding child pornography, all

6    of the child pornography or suspected child pornography

7    that we locate is then submitted to the National Center

8    for Missing and Exploited Children.

9            The National Center will then compare the

10   videos and image files it receives against known images

11   and video files.  Once they've done that, they will

12   provide a report and send it back to law enforcement and

13   tell them the number of identified child victims that a

14   person may have had on their computer during our

15   investigation.

16       Q    Did Argonaut include any text along with this

17   posting?

18       A    Yes.  It included the text "aard_900.avi."

19       Q    That's the file name of the video that was

20   being shared?

21       A    That's correct.

22       Q    And what is the significance of seeing ".avi"

23   at the end of a file name?

24       A    Again, it indicates that it is a video file.

25       Q    Did Argonaut include a contact sheet regarding

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   the contents of the video?

2        A    Yes.

3        Q    Do you see that depicted on Government's 3D?

4        A    I do.

5        Q    Could you please describe the images?

6        A    Yes.  It is what appears to be a prepubescent

7   male child both grasping an adult male penis and

8   performing oral sex on an adult male penis.

9        Q    On the second page of Government's 3D, did

10  Argonaut include links where the full video or videos

11  could be downloaded?

12       A    Yes.

13       Q    And was it one link or more than one?

14       A    No.  There were multiple links to access the

15  file.

16       Q    And what was the purpose of that, of there

17  being multiple links to go to?

18       A    There's several purposes.  One, if one of the

19  uploading sites goes down, there's another one that's

20  available.  Or if the file is too large, oftentimes it

21  will be broken down into smaller chunks so you could

22  download smaller chunks of the file.

23       Q    Did Argonaut include a password that could be

24  used to decrypt those encrypted containers?

25       A    He did.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1      Q     In your undercover session on the site, did you

2  also document and record administrative sort of activity

3  that Argonaut conducted?

4      A     I did.

5      Q     I show you Government's 3A.  What is depicted

6  on Government's 3A?

7      A     These are moderator logs within the Moderator

8  Control Panel.

9      Q     So, first, what's, what's a Moderator Control

10 Panel?

11     A     It's a control panel for moderators, who are

12 persons that are given special authority to enforce rules

13 on the site; and this specific portion shows the logs

14 within that control panel.  The logs would be detailing

15 all of the actions taken by the moderators.

16     Q     There's a box there that says "Search for

17 Keywords," and it has the word "Argonaut" in it.  What

18 does that mean?

19     A     Specifically, I typed in the user "Argonaut,"

20 so I was seeking moderator logs specific to the user

21 Argonaut.

22     Q     And does this particular page depict all of

23 the, depict the results of that search?

24     A     It does.

25     Q     And what sorts of actions does it indicate that

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    Argonaut performed that we can see on the exhibit?

2         A    Primarily deleting posts.

3         Q    And why is it that a moderator or administrator

4    of this site would be deleting posts off of TLZ?

5         A    So a lot of the contributions of child

6    pornography, the links to access them, are dead or no

7    longer working.  So that would just be taking up space on

8    the site, or it would be useless because users wouldn't

9    be able to access the content that used to be there.  So

10   moderators will go through and delete those posts and get

11   rid of them.

12        Q    Showing you Government's 3C, what do we see on

13   Government's 3C?

14        A    This was a search for posts conducted by, of

15   the user Argonaut.

16        Q    And how did you, how did you find that?  How

17   did you run and get these search results?

18        A    Again, using the search feature specific to

19   just posts within TLZ, I typed in the user Argonaut; and

20   I got approximately 2100 results.

21        Q    And what sorts of postings by Argonaut do we

22   see depicted on Exhibit 3C?

23        A    Mostly in a moderator capacity, advising users

24   to do or change certain things, ultimately enforcing

25   rules of the site, TLZ.

1      Q    And what sorts of action was he either advising

2    or requiring users to take?

3      A    So in the initial post, he's advising that

4    "These links were posted last month"; and "You don't get

5    credit for them twice," essentially indicating if you're

6    going to do a contribution, your monthly contribution of

7    child pornography, you have to give new material.  You

8    can't use the same stuff.

9            Below that, he's telling a user to "edit your

10   post to include contribution information so we can

11   approve it" -- again, just enforcing one of those minutia

12   rules about having contribution information regarding the

13   child pornography that you're posting so the admin team

14   can approve it.

15           Below that, detailing about "some files are

16   spaces, and others have underscores; change one to the

17   other."  Again, this was in regards to a post where

18   someone was trying to access a file and was having

19   issues.  So he's advising that there's missing

20   underscores, missing spaces, things of that nature.

21     Q    Technical sort of details to improve the

22   functioning of the site?

23     A    Yes.

24     Q    You can take a look at Government's 3B.  And

25   what do we see on Government's 3B?

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1          A      The very top is a contact sheet or storyboard.

2     There are several threads of that nature.

3          Q      How does Government's 3B relate back to

4     Government's 3C that we just looked at?

5          A      So whereas 3C was a specific search for the

6     user Argonaut, these are actually posts and threads where

7     the conversation between Argonaut and other users flows

8     chronologically as it would have on the site.

9          Q      So the way it appeared to the users as opposed

10    to that sort of search box that we looked at?

11         A      Correct.

12         Q      Starting with the second -- sorry -- second

13    page of Government's 3B, what posting do we see by the

14    user Argonaut?

15         A      He's telling the user Auralien that these files

16    that, in the storyboard should be split into a maximum

17    size of 100 megabytes per part.

18         Q      Can you tell why that, that advice was

19    necessary?

20         A      Again, it's a general rule on the site that

21    files that are made available for others to access should

22    be no larger than 100 megs.  Whether that be through the

23    speed at which Tor operated or just ease of use in

24    downloading, the general rule was that those files be

25    available in no larger sizes than 100 megabytes.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1     Q    And from looking at this post and the post just

2 before it, can you tell whether the user took an action

3 in response to what the user was told to do by Argonaut?

4     A    Yes.  The user edited the post.

5     Q    And how many parts does it appear to have been

6 split into?

7     A    Two parts.

8     Q    Page 3 of Exhibit 3B, do you see a posting

9 there by Argonaut?

10    A    Yes.

11    Q    And what did Argonaut advise another user to

12 do?

13    A    "Please edit your post to include contribution

14 information so we can approve it."

15    Q    Again, does it appear that the user took an

16 action in response to Argonaut's command?

17    A    Yes.  The user edited that post a total of two

18 times in response.

19    Q    Page 4 of Exhibit 3-- excuse me, 3B.  Do we see

20 a post by Argonaut there?

21    A    Yes.  Argonaut is indicating "These links were

22 posted last month.  You don't get credit for them twice,"

23 again referring back to:  Your contributions must be

24 newer material.  You don't get credit for posting the

25 same child pornography related contributions.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1        Q    And then moving to the last page, page 7 of

2   Exhibit 3B, and what sort of posting did Argonaut make

3   here?

4        A    This is in response to something, to somebody

5   stating that something was wrong with the 7z, or 7-Zip,

6   file.  Argonaut states that "Some files have spaces, and

7   others have underscores.  Change one to the other, and it

8   will work."

9        Q    Outside of the actual site, Special Agent

10  Johns, did you also engage in under-- one-on-one

11  undercover contact with Argonaut?

12       A    I did.

13       Q    And over what, what technology?

14       A    I used the messenger application called

15  TorChat.

16       Q    What is TorChat?

17       A    So TorChat is a basic, like, peer-to-peer or

18  person-to-person messenger application.  It's very

19  similar to Yahoo Instant Messenger or AOL Instant

20  Messenger.  What it ultimately boils down to, it is a

21  program that allows two users to type text back and forth

22  and communicate.  It also allows those users to transfer

23  files to one another.

24            The major difference of TorChat versus another

25  messenger application is TorChat works utilizing the Tor

1  network, so it provides a much higher level of anonymity

2  than those other messenger applications do.

3       Q    How do you get TorChat on your computer?

4       A    It's an easy free download on one of the

5  various websites, the main website being GitHub, which is

6  just a repository website for various software.

7       Q    How do you set up your account?

8       A    Once you download it, you open the file and you

9  install it; and upon installing, TorChat automatically

10  generates an ID.  That ID is 16 characters in length.

11  It's alphanumeric, so it's letters and numbers.

12  Generally, it makes no sense.  It just looks like a

13  random string of numbers and characters, but that is the

14  identifying means within TorChat.

15       Q    So how do you find other people to chat with if

16  your username or your screen name is just automatically

17  generated?

18       A    It's most commonly done by sharing it, actually

19  copying and pasting and sharing your TorChat ID with

20  somebody else, whether you do that through email, through

21  a private message in TLZ, through a public board posting.

22  But it's a long, confusing string of characters; so,

23  ultimately, you would have to share it with somebody in

24  some capacity.

25       Q    Is there something called a "buddy list"

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   associated with the TorChat?

2       A    There is.

3       Q    What's that?

4       A    So the buddy list keeps a log or a list of your

5   friends on TorChat that you can message with so you don't

6   have to continually enter that 16-character ID.  Your

7   buddy list allows you to add a contact.  Once you add

8   that contact, you can put a name next to it.  So rather

9   than having to remember this long, confusing 16-character

10  ID, you can input a name that will appear next to that

11  person on your buddy list.

12      Q    Kind of like putting in somebody's name into

13  your contacts on your phone associated with their phone

14  number?

15      A    Exactly.

16      Q    Now, is there some entity behind TorChat that

17  law enforcement could send legal process to, like a

18  subpoena or a search warrant?

19      A    No.  There is not.

20      Q    What account were you using -- what TorChat

21  account were you using when you communicated with

22  Argonaut?

23      A    Again, I was using the online account takeover

24  for the user CWK.

25      Q    Showing you what's previously marked as

1    Government's 25 and 25A, do you recognize 25 and 25A?

2         A    I do.

3         Q    What are they?

4         A    They are logs of my TorChat conversations with

5    the user Argonaut.

6         Q    And how are those sorts of logs of a TorChat

7    communication generated?

8         A    They're generated by selecting the user on your

9    buddy list on TorChat that you're communicating with and

10   choosing the feature to activate logging.

11        Q    Okay.  Are these, 25 and 25A, a fair and

12   accurate log of the TorChat communications you had with

13   Argonaut?

14        A    They are.

15        Q    And what is the distinction between 25 and 25A,

16   if any?

17        A    25A has some highlighted portions.

18             MR. BECKER:  Your Honor, move to admit

19   Government's 25 and 25A.

20             MR. KRAEMER:  No objection, Your Honor.

21             THE COURT:  25 and 25A are admitted.

22   BY MR. BECKER:

23        Q    Special Agent Johns, what was the general range

24   of dates that you communicated, during which you

25   communicated with Argonaut?

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1      A      This was September 22, 2014, to October 16,

2    2014.

3      Q      And what was the significance of the

4    communications ending on October 16th of 2014?

5      A      That was the day that the search warrant was

6    executed at the residence of Jason Gmoser.

7      Q      What sort of topics did you talk about with

8    Argonaut during those communica-- during these

9    communications?

10     A      We spoke about the operation of the site TLZ,

11   TLZ users, and just a lot of general banter.

12     Q      When you say "general banter," what do you

13   mean?

14     A      Jokes, talking about kind of issues outside of

15   the site, just kind of general conversations that you

16   would have with somebody.

17     Q      Now, when you take over the CWK account, you

18   have to impersonate that person during these sorts of

19   communications, right?

20     A      That's correct.

21     Q      Did it appear as though there was -- did it

22   appear as though Argonaut and CWK had already known each

23   other?

24     A      Yes, it did.

25     Q      Did Argonaut appear coherent in his

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
1   communications with you?

2       A    Yes, he did.

3       Q    Were any of the communications irrational or

4   illogical?

5       A    No.

6       Q    Did he make jokes?

7       A    Yes.

8       Q    Okay.  I'll show you -- have you reviewed

9   digital copies of Exhibits 25 and 25A on the trial laptop

10  in front of me?

11      A    I have.

12      Q    Are they fair and accurate digital copies of 25

13  and 25A?

14      A    They are.

15           MR. BECKER:  Your Honor, permission to publish

16  Exhibits 25 and 25A?

17           THE COURT:  Go ahead and publish.

18           MR. BECKER:  For the record, showing you

19  Government's Exhibit 25A.

20  BY MR. BECKER:

21      Q    All right.  Starting on the first page of

22  Government's 25A, the first text on that page, Special

23  Agent Johns, says, "This log file is not signed and has

24  no cogency of proof," and then there's a line, "Logging

25  started."  Can you explain that for us?
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1      A     Yes.  Anytime you activate the login feature,

2  by default it will stamp that first line, "This log file

3  is not signed and has no cogency of proof," followed by

4  the date and time that you activated the login, and the

5  statement "Logging started."

6      Q     Does the statement "The log file is not signed

7  and has no cogency of proof," does it mean anything in

8  particular?

9      A     Not to me.  It does not.

10     Q     And then if you can explain to us sort of the

11 structure of this log so we can understand it.  Going

12 from left to right, what information do we see?

13     A     So on the left side within the parentheses, you

14 will see first the date that the communication occurred;

15 and then directly to the right of the date, still within

16 the parentheses, is the time stamp that the communication

17 occurred.

18         Outside of the parentheses, you will see the

19 user that is typing the communication.  So there is two

20 users in this log, Argonaut and myself.  "Myself" is what

21 is automatically stamped on your own logs; so that would

22 be CWK, the user CWK.  And then to the right of that is

23 the content of those communications that were typed.

24     Q     So because this is your TorChat log, it says

25 "myself" for your communications?

 1      A      That's correct.

 2      Q      I want to ask you about some, some chat on the

 3   second page of Exhibit 25A.  Starting at about --

 4   starting on October 10th, starting at about 10:04, there

 5   is a conversation about polls.  Can you explain the

 6   context of that?

 7      A      Yes.  So after reviewing the user CWK's account

 8   and trying to impersonate him as best as we can, one of

 9   the things that he liked to do was post polls,

10   essentially just general questions and illicit responses

11   from the users.

12           So the polls really in, in point aren't that

13   different from what you see in election polls.  How do

14   you feel about person A?  Person B?  The exception here,

15   the polls were generally as it relates to a sexual

16   interest in children.

17      Q      And what did Argonaut indicate in, regarding a

18   poll that he would be interested in?

19      A      So I asked Argonaut if he had thoughts on my

20   next poll, and his response was "I'm interested in

21   knowing the amount of people that have had some sort of

22   sexual contact with a child with other people in the

23   room, friends, family, total antis.  How much risk was

24   involved, and what did you do?"

25      Q      The term "total antis," what does that mean?

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1       A     Antis is a term used to describe people that
2   don't have similar beliefs of the users on TLZ, so that
3   don't hold the belief of sexual interest in children and
4   that's, that's okay.
5       Q     And what is the reference to "risk involved"?
6       A     Essentially, the level of risk of being caught;
7   so if you're having a sexual experience with a child and
8   there's others around, what was the level of risk of you
9   being caught?
10      Q     Let's move to page 4 of Exhibit 25A, October
11  14th, 9:23.  Argonaut makes a particular comment.  Can
12  you explain it?
13      A     Yes.  Argonaut states, "Had to jump into
14  managing the PZ for a little bit, so now I know how."
15  And that was in response to us generally discussing that
16  we were spread a little thin and working hard to keep the
17  moderation going.
18      Q     The moderation of?
19      A     TLZ.
20      Q     And "PZ" referring to?
21      A     The Private Zone.
22      Q     Further down on 25A, page 4, there's another
23  highlighted section at 23:08.  Can you give us the
24  context for that conversation?
25      A     Yes.  I was asking Argonaut what he thought

1    about a post wherein some individuals thought that CWK

2    might have been law enforcement or might have been a bad

3    person because a child pornography producer on the site

4    by the name of Lexie was caught by law enforcement.

5           So, essentially, they had drawn the conclusion

6    that:  Lexie's caught.  CWK hasn't been around for a

7    while.  It's possible that he's bad.

8           So having a concern that my undercover identity

9    might be blown, I was polling another co-admin on TLZ,

10   being Argonaut, to see what his thoughts were about the

11   post, to see how my undercover status was.

12        Q    Was it common for potential law enforcement

13   infiltration to have been discussed among TLZ users?

14        A    Yes.  It was very common.

15        Q    Let's move to page 5 of 25A -- specifically,

16   the bottom of page 5/beginning of page 6.  There's a

17   highlighted portion on October 15, 13:34.  Can you

18   explain the context of the conversation just before that?

19        A    Yes.  So Argonaut had told me that he had to

20   leave for a meeting; and when he came back, I asked how

21   the meeting was.

22           He informed me that he had just had lunch with

23   his dad.  So I told him that that's not a meeting, to

24   which he responded that it's -- "What?  It's only a

25   meeting if he sells me drugs?"  And then he said, "I'm

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   kidding."

2           I said, "Pretty much, or a child."

3           And his response to that was, "Shit, if he'd

4   sell me a child, that would be awesome.  What do you

5   think the going rate is for a little white boy?  LOL."

6           I responded, half joking, "$10,000."

7           He then later responds, "Thinking I'd pay 10K."

8       Q   So when you say you engaged in banter with the

9   user Argonaut, is this an example of one of those sorts

10  of conversations?

11      A   Yes, it is.

12      Q   Move to page 7 of 25A.  There's a highlighted

13  portion, again, October 15, about 13:56.  Can you explain

14  the context of the conversation at that point?

15      A   Yes.  We were discussing a pedo crowdfunding

16  hidden service on Tor; and that standing for "pedo," as

17  in pedophile, and then "crowdfunding," a manner in which

18  people get small contributions to pay for one item or one

19  service.

20          So in this instance, it was a number of people

21  can put in small amounts of money, and the service that

22  they would provide was a newly produced child pornography

23  video.

24          So in response to discussing that pedo

25  crowdfunding site, Argonaut said, "They want 4 BTC for 40

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    seconds of video" -- "BTC" referring to bitcoins.  And

2    then the next statement was, "And it looks like legal

3    porn."

4         I responded, "I know.  Crazy talk.  All JB

5    stuff" -- "JB" standing for jailbait, or the term of age

6    where a child is starting to look less like a child and

7    more like an adult.

8         Argonaut's response was, "For 4 bitcoin, I want

9    to fuck a boy and be in the porn."

10   Q    What is a bitcoin?

11   A    Bitcoin is a digital currency.  It is not

12   recognized by most governments.  It is entirely

13   anonymous, and it is virtually untraceable.  So you can

14   use any type of currency, any type of real currency like

15   U.S. dollars or European euros, go online to a bitcoin

16   exchange, give them your real currency.  They will, in

17   turn, give you this bitcoin digital currency that you can

18   use to purchase an increasing number of things in the

19   world.

20   Q    And so can you help us understand the comment

21   about 4 bitcoin for the video and then the comment about

22   how it looks like legal porn?  What was the context of

23   that?

24   A    It looks like legal porn versus what they're

25   offering, which is illegal or child pornography.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1        Q     Move to page 8 of Exhibit 25A.  There's a

2    highlighted section October 15th, 14:27, starting with

3    "Argonaut:  Federal police."  Can you explain what

4    happened here?

5        A     Yes.  Argonaut was posting to bring to my

6    attention that federal police carried out an operation to

7    combat pedophilia.  So the start of that post actually

8    contains the date and time that it was generated, which

9    was October 15, 2014, at 8:40, and then was later updated

10   on that same date at 9:57 a.m.

11          The post also had what appears to be a copy and

12   paste of the actual article about this operation that

13   occurred.

14       Q     This is a news article that he sort of copied

15   into your chat?

16       A     That's correct.

17       Q     And what was the news article about?

18       A     So the news article was about a Brazilian

19   federal police investigation on the Deep Web -- which is

20   generally a reference to Tor, Dark Web or Deep Web -- in

21   which they were specifically targeting child exploitation

22   and had rescued a number of children and over the period

23   of one year had analyzed 14 IP addresses and worked in

24   total on 14 IP addresses in their one-year investigation.

25       Q     So if we move to the top of page 9, is there,

1    is the rest of that pasted news article there on page 9?

2        A    It is.

3        Q    And what was Argo-- after sending you the text

4    of this news article, what was Argonaut's comment about

5    it?

6        A    He stated, "Took a year to analyze 14 IPs," or

7    IP addresses, "... that's just ... so huge."  So,

8    essentially, he was making a sarcastic remark about the

9    fact that the Brazilian federal police in one year were

10   only able to investigate 14 IP addresses.

11       Q    The comment being that wasn't very many for a

12   year-long investigation?

13       A    Exactly.

14       Q    Further down on page 9 of Exhibit 25A, just

15   under the highlighted section here, 14:50, there's a

16   comment by Argonaut.  Can you explain that, that comment

17   or that message?

18       A    Yes.  So Argonaut is telling me that he posted

19   Tara's Instagram name, asks me if I want it, and then

20   posts a true name of an individual and an Instagram

21   account name.

22            He's referring to Tara, an identified child

23   pornography series and an identified victim that is very

24   well known.  So he posted that person's real name and

25   their actual account.  That person's now a grown adult.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1      Q     And that -- the reference to Tara, what is the

2     significance of a series being called by that particular

3     name?  Can you explain that?

4      A     The series being called by Tara, that's

5     actually the, the name that is used by offenders in the

6     series.  It's not her real name.  It's the identified

7     series name of Tara.

8      Q     Now, there's a portion on Exhibit 9 -- sorry,

9     Exhibit 25A that's been redacted.  Was -- what portions

10    have been redacted in this?

11     A     The true name of the actual victim of the Tara

12    series and the Instagram account for that same

13    individual.

14     Q     The -- during your conversation, did Argonaut

15    provide the actual name and the actual Instagram account?

16     A     He did.

17     Q     Showing you page 10 of the Exhibit 25A,

18    highlighted portion, October 15, 15:17.  Argonaut sends

19    you a message.  Can you explain it for us?

20     A     Yes.  So Argonaut and myself were discussing

21    the fact that we were running out of data or storage

22    capacity.  That's digital storage capacity.  And he had

23    told me that he had wrote a program or a piece of code

24    that he referred to as a "dupe finder" that would

25    essentially find duplicatus files so that if you were

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   running out of storage they would identify the duplicate

2   file so that those are files you could get rid of and

3   increase your storage capacity.

4        Q    When you say "storage capacity," you mean space

5   on a computer hard drive?

6        A    Exactly.

7        Q    And then if we go to page 11, still on

8   October 15, 15:24, can you explain what Argonaut told you

9   then?

10        A    Again, we're still kind of talking about this

11   dupe finder program that he wrote, and it's -- we're

12   discussing ways in which that it could be possibly given

13   to me so that I could use it as well.  And Argonaut

14   states, "But I would be concerned giving you something I

15   made like that because I'm sure the developer name and

16   shit like that ends up in the .exe."

17            So, ultimately, if he makes a program which you

18   would deliver to somebody in a .exe, or an executable

19   file, he's concerned that as the developer his personal

20   information might somehow be attached to that file that

21   he would give to me.

22        Q    And why might that be a concern?

23        A    Because he does not want his identity known by

24   anybody associated with TLZ.

25        Q    Page 13 of Exhibit 25A.  So the second

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    highlighted portion down, October 16th now, 9:35 a.m.,

2    does -- what does Argonaut reference again during this

3    conversation, and what was the context?

4        A    Again, he's referencing the Brazilian federal

5    police investigation on the Deep Web, or Tor, referring

6    to it as a "Brazilian honeypot site."

7        Q    What is a "honeypot site"?

8        A    So a honeypot is just a, as in for

9    investigative terms, is creating a location that you want

10   to draw people to; and whether that location be physical

11   or be on the Internet, you want to draw someone into it

12   because they want something there, and you have an

13   ability to track the people that come there.

14       Q    And what did Argonaut indicate as to whether or

15   not he would participate in something like that or access

16   something like that?

17       A    He would not.  And if he did, he would never do

18   it outside of the TBB, or Tor Browser Bundle, to maintain

19   anonymity.

20       Q    Now, this particular piece of the conversation

21   is happening on October 16th of 2014.  What is the

22   significance of that date?

23       A    That was the date that we were executing the

24   warrant at the residence of the defendant.

25       Q    Why was it important -- or why were you

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    chatting with him that day?

2        A    I was chatting with the defendant -- or with

3    the, with Argonaut that day because we were trying to

4    keep the individual on the computer so that the computer

5    was open, on, and no data would be encrypted when we

6    executed the warrant at the residence.

7        Q    Why was -- why was it important that the user

8    that you were executing the search on be at his computer

9    and the computer being on and being used?

10       A    So by being at his computer and utilizing the

11   computer, the computer is open and not locked.

12   Otherwise, the user could encrypt it, which essentially

13   allows us -- does not allow us to see the data without

14   having the encryption password.

15            So executing a search warrant while we know

16   somebody is sitting at the computer greatly increases our

17   chances of getting the evidence without it being

18   destroyed or locked down.

19       Q    And how could somebody -- how easy or difficult

20   is it for someone to activate encryption if they're

21   notified, or if they realize that somebody's coming in to

22   search their computer to seize things?

23       A    It's very simple.  Like most computer programs,

24   the X that you see at the top of the screen, if you click

25   that, you shut it down.  Everything closes down.  It's

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    encrypted.  You could simply pull the power outlet from

2    the wall.  Shut down the computer.  There's several very

3    quick and easy methods to shut that down, and then we no

4    longer have access to encrypted data.

5            MR. BECKER:  Your Honor, at this time we would

6    ask the Court to read and enter Stipulation Number 4.

7            THE COURT:  The parties stipulate and agree

8    that on October 15, 2014, at 1:45 p.m., United States

9    Magistrate Judge Karen L. Litkovitz for the Southern

10   District of Ohio authorized the search of 2000 Smith Road

11   in Hamilton, Ohio, the residence of Jason T. Gmoser.

12   Agents seized Government Exhibit 5 (desktop computer, HP

13   Pavilion Elite 270F, serial number MXX0250GXJ), Exhibit 6

14   (a RAID tower, serial number A328ADAEAR200018), Exhibit 7

15   (another RAID tower with another long serial number), and

16   Exhibits 10A through 10 -- and 10B (documents) pursuant

17   to the Court's authorization on October 16, 2014.

18           Government's Exhibits 4A, 4V -- through 4V were

19   taken by FBI Special Agent Todd Lindgren during the

20   search and are true and accurate depictions of the

21   residence on October 16, 2014.

22           So at this time, Mr. Becker, are you moving to

23   admit -- let's see -- Exhibits 5, 6, 7, 10A, 10B, and 4A

24   through 4V?

25           MR. BECKER:  We are not actually, Your Honor.

1    We'll move individually for the particular exhibits from

2    that series at an appropriate time.

3            THE COURT:  Just remind me they were stipulated

4    to.

5            MR. BECKER:  Thank you, Your Honor.

6            For the record, that is also -- that

7    stipulation is Government's Exhibit 20D.

8            THE COURT:  Okay.

9    BY MR. BECKER:

10   Q    Special Agent Johns, where were you while you

11   were chatting with Argonaut on the morning of

12   October 16th of 2014?

13   A    I was in a parking lot approximately five miles

14   from the defendant's residence.

15   Q    And how was the search structured in order to

16   try to avoid getting encrypted computers or encrypted

17   devices?

18   A    So as I was in the parking lot communicating

19   online, a tactical team was deployed to the residence

20   with the specific instruction to utilize diversionary

21   devices and enter the residence as quickly as possible,

22   locate anybody in the residence as quickly as possible,

23   and detain that individual.

24   Q    Now, would law enforcement while executing a

25   search normally knock and announce their presence as

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    police officers before they entered a premise?

2        A    They would normally do that.  Yes.

3        Q    In this instance, was authority requested from

4    a judge to enter the residence without first knocking and

5    announcing their presence?

6        A    It was.

7        Q    Was that authority granted by the judge who

8    issued the search warrant we heard about in the

9    stipulation?

10       A    It was.

11       Q    And then how did the, the entry team or the

12   tactical team, how did they go about entering the

13   residence?

14       A    So they entered the residence very quickly

15   without announcing their presence.  While entering the

16   residence, they deployed diversionary devices, which are

17   referred to as flashbangs generally.  They emit a very

18   high noise and a very bright light so as to distract the,

19   any person in the residence.

20       Q    And then what did they do with respect to

21   anyone inside the house?

22       A    As soon as they located an individual -- in

23   this case, being the defendant -- they immediately

24   detained that person and pulled that person away from all

25   electronic media.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    Q    And then what happens with respect to the other

2    agents on the scene, such as yourself?

3    A    As soon as the scene was secure and they had

4    the person detained, they immediately called myself and

5    the forensic examiner team to come into the residence and

6    triage the computer or any digital evidence that was

7    there.

8    Q    And is it important that you and the rest of

9    the team act quickly to do that?

10   A    It is.

11   Q    Why is that?

12   A    In case any type of shutdown procedure has been

13   initiated for the encryption that we can stop so that we

14   can see what devices are open and on, and we can make

15   sure computers don't fall asleep or don't lose power if

16   they're on battery backup.

17   Q    Because -- what could happen if a computer goes

18   into a "sleep" mode or a "power off" mode?

19   A    Ultimately, we'd lose access to that data if

20   it's encrypted.

21   Q    Did there come a time where you entered the

22   address of 2000 Smith Road in Hamilton, Ohio, on

23   October 16th of 2014?

24   A    Yes.  A few minutes after the execution of the

25   warrant.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1        Q     Where did you go?
 2        A     I was directed directly to the computer room
 3   where the defendant and several tactical team officers
 4   were.
 5        Q     You say "the defendant."  Were there, were
 6   there any persons in the house other than FBI personnel
 7   or law enforcement officers?
 8        A     Just the defendant.
 9        Q     Can you point -- point out the person you're
10   referring to and identify him by an article of clothing?
11        A     Yes.  With the black pants and checkered white
12   shirt.
13             MR. BECKER:  Your Honor, if the record could
14   reflect an in-court identification of the defendant?
15             THE COURT:  The record will reflect that the
16   witness has identified the defendant, Jason Gmoser.
17   BY MR. BECKER:
18        Q     Where was the defendant when you entered the
19   home?
20        A     He was in the computer room.
21        Q     Were there any other -- I think I already
22   asked -- any other persons in the house other than FBI or
23   law enforcement?
24        A     No.  There were not, except for Mr. Gmoser.
25        Q     Did you, did you have a chance to go through
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    the house and observe it?

2        A    I did.

3        Q    Was there any indication that anyone else lived

4    there, or more than one person lived there?

5        A    No.  There was not.

6        Q    In the computer room, as you described it, what

7    sort of computer equipment did you see?

8        A    There were two computer towers.  There was a

9    laptop computer.  There was a RAID -- or two RAID towers

10   that contained multiple hard drives.  And there was a

11   bunch of other just random media devices, whether they be

12   flash drives, thumb drives, CDs.

13       Q    Did you have a chance to examine the house for

14   other sort of computer related equipment or digital

15   devices?

16       A    I did, briefly.

17       Q    How many searches have you participated in,

18   Agent Johns, in your career?

19       A    Approximately 150 to 200.

20       Q    And has there been a search where you'd seen

21   more computer equipment than you saw at 2000 Smith Road

22   in Hamilton, Ohio?

23       A    Not even close.

24       Q    Did you have a chance to observe the computer

25   screen in that main computer room of the house when you

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    entered?

2         A    Yes.

3         Q    What did you notice about the screen?

4         A    That a shutdown procedure had been initiated by

5    somebody.  I also noticed that the TorChat application

6    for the user Argonaut was present.

7         Q    Were photographs taken of the house as it

8    appeared on October 16th?

9         A    There were.

10        Q    For the record, Special Agent Johns, I've

11   handed you Exhibits 4A, B, C, D, E, F, H, I, Q, W, X, and

12   Y.

13        A    Yes.

14        Q    Do you have all those?

15        A    I do.

16        Q    Do you recognize them?

17        A    I do.

18        Q    What are they?

19        A    They are photographs taken at the search scene.

20        Q    Do they fairly and accurately depict the scene

21   of 2000 Smith Road, Hamilton, Ohio, on October 16th of

22   2014?

23        A    They do.

24             MR. BECKER:  Your Honor, at this time, we'd

25   move to admit Exhibits 4A through F, H, I, Q, W, X, and

1   Y.

2           THE COURT:  Those exhibits are all -- no

3   objection, I presume?

4           MR. KRAEMER:  No objection, sir.

5           THE COURT:  Those exhibits are all admitted at

6   this time.

7   BY MR. BECKER:

8       Q    Special Agent Johns, have you reviewed digital

9   copies of the exhibits I've just read off on the trial

10  computer?

11      A    I have.

12      Q    Are they fair and accurate digital copies of

13  those photos?

14      A    They are.

15          MR. BECKER:  Your Honor, permission to publish

16  those exhibits via the computer?

17          THE COURT:  You may publish those.  I'll

18  caution you:  It's 11:55, so I don't know if you want to

19  launch into this now because I am going to stop you in

20  about four minutes.

21          MR. BECKER:  I think, actually, this one more

22  section would be a good one to get through and then

23  finish, Your Honor.  It should actually just take a few

24  minutes.

25          THE COURT:  Okay.  Go for it.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1            MR. BECKER:  Thank you.

2    BY MR. BECKER:

3        Q    Special Agent Johns, showing you 4A, please

4    describe it.

5        A    This is a picture from the entrance driveway at

6    Mr. Gmoser's residence.  You'll see it on the left side,

7    the mailbox there with the number 2000 on it.

8        Q    And the driveway is located on which side of

9    the picture?

10       A    The left side.

11       Q    4B?

12       A    That is the entrance down the very long

13   driveway at Mr. Gmoser's residence.

14       Q    The vehicles in that, in that picture belong

15   to?

16       A    They are -- they belong to law enforcement.

17       Q    4C?

18       A    That is the exterior of Mr. Gmoser's residence.

19       Q    4D?

20       A    That is the kitchen in Mr. Gmoser's residence.

21       Q    4E?

22       A    This is the computer room that we previously

23   discussed.

24       Q    On the right side of 4E, what do you see?

25       A    There is a computer monitor, a computer tower,

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1  a battery backup; and then on the left side, there are

2  two RAID towers containing several hard drives.

3      Q    Those were connected to that computer?

4      A    That's correct.

5      Q    The window appears to be disturbed.  Can you

6  explain that?

7      A    Yes.  The diversionary devices that were

8  previously discussed, one was inserted -- attached to a

9  pole through the window in this room.

10     Q    Is this the room where you observed the

11 defendant?

12     A    That's correct.

13     Q    4F?

14     A    This is, again, a computer -- the computer

15 room.  It just shows it to the right of the window, so at

16 the bottom right -- at the very bottom, you'll see

17 another computer tower.  On top of that little brown

18 desk, you'll see a laptop computer, two computer

19 monitors, and then the previously discussed computer

20 tower and battery backup.

21     Q    Just so the jury can, can see it, can you just

22 circle the computers that you mentioned on the screen in

23 front of you?

24     A    Yes.  So there's a computer tower here.  That's

25 a laptop computer, monitors, previous computer tower, and

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    the battery backup.

2         Q    Thank you.

3              Showing you 4H, what's 4H?

4         A    That is the defendant's bedroom.

5         Q    And where was this bedroom with respect to that

6    computer room that we saw?

7         A    Across the hallway from the computer room.

8         Q    Were there other bedrooms in the home?

9         A    There were.

10        Q    Did they appear to be inhabited by anyone?

11        A    No.  They did not.

12        Q    4I?

13        A    This is the living area on the entrance floor

14   of the defendant's residence.

15        Q    4Q?

16        A    So this is behind the living area that we had

17   previously shown a picture of, looking out towards the

18   front of the residence.  This contains a book shelf with

19   several hard drives, CDs, DVDs, toner, things of that

20   nature.

21        Q    4W?

22        A    This is again from the computer room.  This is

23   the back wall of that computer room with an egress, or

24   closet, showing a safe at the bottom right.

25        Q    Bottom -- where do you see the safe on that, on

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   that photo?

2       A    I'm sorry.  It's on the bottom right of the

3   shelving, but in the center to the left side of the

4   photo.

5       Q    Did that appear to be any particular kind of

6   safe?

7       A    Yes.  It had the marking "USB safe" on the

8   front.

9       Q    What is USB?

10      A    So, universal serial bus, it's just a

11  connection cord that connects a computer to other digital

12  devices, whether that be printers, hard drives -- really

13  just a standard connection device.

14      Q    Showing you 4X, what does that show with

15  respect to the safe?

16      A    That shows the safe in the open position.  And

17  then on the right side along the door, you see external

18  hard drives that are connected to -- or one is connected

19  to a cord.

20      Q    And 4Y?

21      A    4Y is a close-up of that same door, and you can

22  see the silver external hard drive and then the black

23  external hard drive in that door panel.

24      Q    And what did it appear -- had you ever seen a

25  safe like this?

1      A      I had not.

2      Q      What did it appear to allow someone to do?

3      A      It appeared to allow someone to plug a USB cord

4   on the exterior of the closed and locked safe so that a

5   computer on the exterior could access a device on the

6   interior, thereby being able to transfer data or recall

7   data to the computer.

8      Q      Without, without even opening the safe or

9   unlocking the safe?

10     A      Correct.

11            MR. BECKER:  Your Honor, that's an appropriate

12   stopping point for, for us if the Court would like to

13   take our lunch break.

14            THE COURT:  Sure.  That sounds good to me.

15            Ladies and gentlemen, it's -- we're about

16   30 seconds away from straight up 12:00.

17            MR. BECKER:  Actually, I'm sorry, Your Honor.

18   If we could get three more minutes, we could actually

19   finish with Special Agent Johns' direct.  I apologize, if

20   that's --

21            THE COURT:  I'll give you the three.  I

22   normally would not, but I'll give it to you today.

23            MR. BECKER:  Thank you, Your Honor.  Apologies.

24   BY MR. BECKER:

25     Q      Special Agent Johns, was Jason Gmoser

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1  interviewed during the course of the search?

2      A    He was.

3      Q    Where did the interview take place?

4      A    It took place on the top floor in the master

5  bedroom.

6      Q    Who participated in that interview?

7      A    Myself, Special Agent Pamela Kirschner, and Mr.

8  Gmoser.

9      Q    Was it recorded?

10     A    It was.

11     Q    How?

12     A    Audio.

13     Q    Was Mr. Gmoser, the defendant, advised of his

14  Miranda rights during the course of the interview?

15     A    He was.

16     Q    Did he agree to speak with you?

17     A    He did.

18     Q    During the course of that interview, did he

19  admit being Argonaut from TLZ?

20     A    He did.

21         MR. BECKER:  Your Honor, the last thing we

22  would do is just move to admit Government Exhibits 5, 6,

23  and 7 at this time, which are physical exhibits that we

24  have.

25         THE COURT:  5, 6, and 7.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1              5 is the actual desktop computer, and 6 and 7
 2    are the two RAID towers?
 3              MR. BECKER:  That's correct, Your Honor.
 4              THE COURT:  Any objection, Mr. Kraemer?
 5              MR. KRAEMER:  No, sir.
 6              MR. BECKER:  For the record, Special Agent
 7    O'Donnell is bringing Exhibit 5 to the witness stand.
 8              THE COURT:  All right.  Exhibits 5, 6, and 7
 9    are admitted.
10    BY MR. BECKER:
11         Q    Special Agent Johns, is that one of the
12    computers that you testified about from the computer room
13    at 2000 Smith Road, Hamilton, Ohio, seized on October 16,
14    2014?
15         A    It is.
16         Q    And if we could have 6 and 7.
17              Showing you Exhibit 6, is that one of the RAID
18    towers seized from that computer room at 2000 Smith Road,
19    October 16, 2014?
20         A    It is.
21         Q    And, lastly, showing you Government's
22    Exhibit 7, and is that the second of the two RAID towers
23    seized from 2000 Smith Road, October 16, 2014?
24         A    It is.
25              MR. BECKER:  No further questions for the
```

```
1   witness, Your Honor.  We appreciate those last few

2   minutes.

3              THE COURT:  No problem.

4              All right, ladies and gentlemen, you're going

5   to go to lunch now.

6              I have to do some other things in a different

7   case now, so I'm thinking about how I'm going to work

8   this out.  Why don't you come back here at about -- how

9   about come back about 1:10, and we'll try to bring you

10  back in about 1:15.

11             It's -- and in case -- since I continually give

12  you weather updates during this trial, it's 19 degrees.

13  With the wind, that feels like 3 degrees.  It's been

14  snowing on and off.  So it's cold.  Stay warm.  All

15  right.

16             Come back about 1:10, and I'll see you at 1:15.

17                 (Jury absent, 12:04 p.m.)

18             THE COURT:  Come back at 1:10.

19                 (Recess, 12:05 p.m. to 1:19 p.m.)

20             THE COURT:  It's 1:19.  We have all parties and

21  Defendant present.

22             Mr. Becker, you were going to resume your

23  examination.

24             Mr. Kraemer, any reason not to bring the jury

25  in?
```

1          MR. KRAEMER:  No, sir.

2          THE COURT:  All right.  They're all back,

3    right?  Let's bring them in.

4               (Jury present, 1:20 p.m.)

5          THE COURT:  Everybody have a seat.

6          As you sit down for a second, you may notice

7    that it's warmer in here because now the official GSA

8    thermometer says it is 72.5.  So it's gone up three and a

9    half degrees.

10         I will tell you, though, in the last ten

11   minutes since we've been in here, it's gone up half a

12   degree.  So if, in about an hour it's up to 75, we'll

13   know GSA said, you know, "You want it hot, Judge?  Here

14   you go, Buddy," and cranked it up.

15         So, I'll keep watching it.  We'll see.

16         All right.  Mr. Becker, we have Mr. Johns on

17   the stand.

18         You understand you're still under oath,

19   correct?

20         WITNESS JOHNS:  Yes, Your Honor.

21         THE COURT:  All right.  Mr. Becker, you may

22   continue.

23         MR. BECKER:  Your Honor, we have no further

24   questions for Special Agent Johns at this time.

25         THE COURT:  All right.  Mr. Kraemer to you.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1              MR. KRAEMER:  Thank you, sir.

 2                 CROSS-EXAMINATION BY MR. KRAEMER:

 3       Q    Agent Johns, we've met before?

 4       A    We have.

 5       Q    Okay.  I just have a few questions for you.

 6  You spoke earlier about the type of warrant that was

 7  executed at Mr. Gmoser's house.  You said that normally

 8  when a police officer executes a search warrant, he

 9  knocks on the front door and goes through, correct?

10       A    Yeah.  Knock and announce prior to entering,

11  yes.

12       Q    Okay.  That's not what happened here, though,

13  correct.

14       A    That's correct.

15       Q    Flashbangs?

16       A    Correct.

17       Q    Multiple agents?

18       A    Correct.

19       Q    How many agents are we talking?

20       A    I didn't actually see the execution of the

21  search.  Somewhere between 10 and 20 tactical agents.

22  Not all of them went into the residence though.

23       Q    Okay.  What's a flashbang do?

24       A    It makes a loud noise and emits a very bright

25  light.
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    Q    Okay.  So for somebody who's never been on the

2  receiving end of one, I mean, the general purpose would

3  be to scare the crap out of somebody inside the house,

4  correct?

5    A    Its general purpose is a diversionary tactic to

6  stun the person so that they can't cause harm to law

7  enforcement.

8    Q    Okay.  So as to distract them?

9    A    Correct.

10   Q    Catch them off guard?

11   A    Correct.

12   Q    Okay.  It's a pretty intense event, right?

13   A    It is.

14   Q    Okay.  There were multiple flashbangs executed

15  at Mr. Gmoser's house, correct?

16   A    Correct.

17   Q    Okay.  And this is -- to be clear, this was at

18  2000 Smith Road?

19   A    Correct.

20   Q    Okay.  Jason Gmoser doesn't own that residence,

21  though, correct?

22   A    Not to my knowledge.

23   Q    Okay.  Are you aware of who does own the

24  residence?

25   A    I believe it was his father.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1      Q    Okay.  And you learned that as part of your

2  interview with Mr. Gmoser; is that correct?

3      A    I learned that during the course of the day.

4  Yes.

5      Q    Okay.  You participated in the interview with

6  Mr. Gmoser after you arrived at the residence, correct?

7      A    That's correct.

8      Q    Okay.  We heard testimony from Special Agent

9  O'Donnell that members of The Love Zone were told not to

10  talk to law enforcement.  Are you familiar with the rules

11  and that of The Love Zone?

12      A    Not that particular posting or rule, no.

13      Q    Okay.  Would it be fair to say in your

14  experience, in your work as taking over identities, that

15  a fear of law enforcement was prevalent through users of

16  The Love Zone?

17      A    Yes.

18      Q    Okay.  And generally the attitude of users of

19  The Love Zone would be that of noncooperation?

20      A    On the board itself, yes.

21      Q    Okay.  But when you arrived at Mr. Gmoser's

22  house, Mr. Gmoser sat down with you and, I believe,

23  Special Agent Kirschner for this interview, correct?

24      A    That's correct.

25      Q    Okay.  Now, this is moments after flashbangs;

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    the 10 to 20 agents rushed the house; and I'm assuming

2    someone grabbed or apprehended or tackled him, correct?

3        A    I don't know what happened to him.  I know

4    where he was when I entered the residence.  He was being

5    detained on the floor of the residence.

6        Q    Okay.  And I believe during your interview with

7    him, you even asked him if he was okay physically because

8    of the intensity of the event, correct?

9        A    Correct.

10       Q    Okay.  And you asked him about his employment,

11   correct?

12           MR. BECKER:  Object to scope.

13           THE COURT:  Well, he -- no.  Overruled.

14       A    The interview was recorded in audio.  I don't

15   recall every aspect.  It was several hours.  It's

16   possible I asked him about his employment.

17       Q    Okay.  Let me, let me ask you a different way.

18   You had been communicating with Mr. Gmoser on a TorChat

19   prior to the execution of the search warrant, correct?

20       A    That's correct.

21       Q    Okay.  This was on what day of the week?

22       A    I don't recall.  It was October 16th.

23       Q    Okay.  It was a weekday though, correct?

24       A    Yes.

25       Q    Okay.  And it was during regular business

 1  hours?

 2      A    Correct.

 3      Q    Okay.  So obviously he wasn't holding down a

 4  9:00 to 5:00 job?

 5      A    Correct.

 6      Q    Okay.  And you've not learned anything

 7  differently through the course of your investigation that

 8  he had some other kind of job, correct?

 9      A    That's correct.

10      Q    Okay.  Do you remember talking with him when

11  you first entered -- or, I'm sorry, when you first began

12  the interview about him having some other place to be?

13      A    I mean, it's a general question I ask, if

14  there's anywhere they have to be, anyone they have to

15  contact.

16      Q    Do you recall Mr. Gmoser saying to you, you

17  know, "I'd like to sit here and talk to you, but I've got

18  to go take my car to the dealership to be fixed"?

19      A    I do recall him saying that he had to take his

20  car to the dealership.  Yes.

21      Q    Did that seem a little odd to you after

22  someone's had flashbangs thrown through their windows?

23          MR. BECKER:  Objection, relevance.

24          THE COURT:  I'll sustain that objection.

25  That's not relevant.

1          MR. KRAEMER:  Okay.

2    BY MR. KRAEMER:

3          Q    You spoke earlier during, during your direct

4    testimony about your TorChat with Mr. Gmoser.

5          A    Uh-huh.

6          Q    And you said that he appeared coherent in his

7    discussion with you, correct?

8          A    Correct.

9          Q    Okay.  And when we say "coherent," we're saying

10   that he was able to type back to you legible sentences,

11   correct?

12         A    Yeah.  That and that they made sense.

13         Q    Okay.  But, I mean, obviously you're not able

14   to see him, correct?

15         A    Correct.

16         Q    Okay.  You're not listening to him, correct?

17         A    Correct.  Just reading text.

18         Q    Okay.  And that had been the extent of your

19   contact to that point?

20         A    That's correct.

21         Q    Okay.  During that TorChat that you had with

22   Mr. Gmoser, it went on for several pages.  And while you

23   did discuss the board, you also discussed things like a

24   man being suspended by his penis from a rope, correct?

25         A    Correct.

1      Q    You joked with him about buying and selling of

2   kids, correct?

3      A    Correct.

4      Q    You joked about a man having a 160-pound tumor

5   in his crotch and wearing a hoodie for his pants,

6   correct?

7      A    That's correct.

8      Q    There weren't any discussions about the

9   presidential election of 2016 or any kind of business

10  related discussions or anything like that, were there?

11     A    There was nothing relating to business or

12  elections.  No.

13     Q    Okay.  I guess what I'm saying is:  There were

14  no discussions about anything of any kind of educational

15  or intellectual manner; this was more of a Beavis and

16  Butt-Head type of exchange, wasn't it?

17     A    No.  There were -- we exchanged issues where I

18  was essentially trying to state that I was having some

19  real world problems, because a lot of this is on the

20  Internet, expressing that I had family members that I

21  was -- that were sick with cancer.

22          He kind of expressed an empathy there, telling

23  me, you know, how bad and how terrible cancer is; and

24  related to me that he lost his mother to that very same

25  disease.

1           So there were no more serious discussions

2     involved in that other than just general jokes and banter

3     like I previous stated.

4           Q    You knew going into that discussion already

5     that his mother died of cancer, correct?

6           A    I did not actually.

7           Q    You did not?

8           A    I did not.

9           Q    That was not part of your search warrant

10    preparation materials or anything like that?

11          A    That was something that we were seeking to

12    learn during the course of the interview.  But, no, I did

13    not know that prior to going in.

14          Q    You spoke when you testified on direct about

15    the amount of computer equipment that was in the house.

16          A    Yes.

17          Q    And you said:  Well, there was a lot.

18          A    Yes.

19          Q    Okay.  You don't need that much, though, to be

20    on The Love Zone, do you?

21          A    You just need to have a computer to get on The

22    Love Zone.

23          Q    I mean, a lot of that stuff had no affiliation

24    with The Love Zone, correct?

25          A    I didn't do the exam of that material.  I

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    couldn't tell you -- I couldn't possibly tell you the

2    affiliation to The Love Zone.

3         Q    But you did have a discussion with him about

4    the several different computers in the basement that were

5    Bitcoin miners, correct?

6         A    Yes.  That's correct.

7         Q    There's no connection between those and the

8    material on The Love Zone, correct?

9         A    That's correct.

10             MR. KRAEMER:  Okay.  I don't have any further

11   questions for Agent Johns at this time, Your Honor.

12             THE COURT:  Thank you, Mr. Kraemer.

13             Mr. Becker, any redirect?

14             MR. BECKER:  Yes, Your Honor.

15              REDIRECT EXAMINATION BY MR. BECKER:

16        Q    Special Agent Johns, did you participate in the

17   investigation of other co-administrator level members of

18   TLZ?

19             MR. KRAEMER:  Objection, Your Honor.  It's

20   outside the scope of cross.

21             THE COURT:  I'll overrule at this time, Mr.

22   Becker, but you better make it relevant.  Put it within

23   the scope.

24   BY MR. BECKER:

25        Q    You were asked some questions on

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    cross-examination about the fact that the defendant,

2    Jason Gmoser, cooperated with law enforcement sort of in

3    violation of the rules of TLZ.

4          Was that unusual among other co-administrators?

5          A    No.  It was not.

6          MR. KRAEMER:  I'm going to renew my objection,

7    Your Honor, as to relevance.

8          THE COURT:  No.  That's within the scope

9    of your -- it is relevant, and it's within the scope of

10   your cross-examination.

11   BY MR. BECKER:

12         Q    Remind us how you obtained the use of the

13   account CWK in order to communicate with Mr. Gmoser.

14         A    It was voluntarily provided as a law

15   enforcement takeover on the day of Andrew Hoff, who was

16   known as CWK on TLZ, voluntarily provided.

17         Q    And you mentioned that you had a conversation,

18   or part of your conversation over TorChat with Mr. Gmoser

19   involved some talking about your fam-- your respective

20   families or family problems; is that right?

21         A    That's correct.

22         Q    Do we have Exhibit 25A from the table, please?

23         Showing you Government's 25A, do you see that

24   conversation depicted on the third page of 25A?

25   Directing your attention to October 14th --

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1        A      I do.

2        Q      -- approximately 9:00 a.m.

3        A      Yes.

4        Q      And can you describe that conversation for us?

5        A      Yes.  At that time, I'm telling the user

6   Argonaut, "Family member is really sick; same reason that

7   I had taken a big break earlier" -- again, trying to

8   fulfill that role of undercover and show why CWK hasn't

9   been around on the board for a while.

10             Argonaut responds, "Ah, that sucks.  Sickness

11  is shitty."

12             I say, "Yes, it's not looking good."

13             And his response is, "Watching my mom die from

14  cancer was really fucking terrible."

15             I respond with, "Ouch, yes, fucking awful.

16  That is what I'm watching now with my brother."

17             And then Argonaut asks, "I thought he was doing

18  better."

19             I had not, in my own undercover conversations,

20  discussed with Argonaut since taking over the account my

21  brother, so this apparently -- this is a reference to a

22  previous conversation with the real CWK.

23             MR. BECKER:  Thank you.  No further questions.

24             THE COURT:  Any additional cross, Mr. Kraemer?

25             MR. KRAEMER:  No, sir.

1              THE COURT:  You may step down, Agent Johns.

2                  (Witness Johns excused, 1:34 p.m.)

3              THE COURT:  Mrs. Peirson, Mr. Becker, you may

4     call your next.

5              MS. PEIRSON:  Your Honor the government calls

6     Special Agent Pamela Kirschner.

7                  PAMELA KIRSCHNER, sworn, 1:37 p.m.,

8                  DIRECT EXAMINATION BY MS. PEIRSON:

9         Q     Good afternoon, Agent Kirschner.

10        A     Good afternoon.

11        Q     Would you please introduce yourself to the

12    ladies and gentlemen of the jury?

13        A     Sure.  Pamela Kirschner.  I'm an FBI special

14    agent with the Cincinnati Division.

15        Q     How long have you been so employed?

16        A     Almost 18 and a half years.

17        Q     And do you -- prior to that time, do you have

18    any prior experience with law enforcement?

19        A     I'm an attorney, but not with law enforcement,

20    no.

21        Q     Okay.  You're an attorney.  Where, where did

22    you -- that means you've gotten your JD; is that right?

23        A     Yes, the Ohio Bar.

24        Q     Okay.  You passed the Ohio Bar.

25              Where did you go to school?  Where did you go

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   to law school?

2       A    Law school at University at Akron and

3   University of Cincinnati.

4       Q    Okay.  And prior to that, do you have a

5   bachelor's degree?

6       A    Yes, in English literature.

7       Q    Did you practice as a, as a lawyer for a while?

8       A    Not necessarily practicing, but I was a

9   research attorney for LexisNexis.

10      Q    And then you joined the FBI shortly after that?

11      A    Yes.

12      Q    Okay.  So you did -- you were an attorney with

13  LexisNexis for how long?

14      A    Approximately two years.

15      Q    Are you the lead case agent on the Cincinnati

16  part of this investigation?

17      A    I am.

18      Q    Okay.  And what are your responsibilities as

19  the case agent?

20      A    As the lead agent, when it came in to

21  Cincinnati, my responsibilities were to coordinate a

22  search of the residence and a possible arrest if we

23  determined it was Argonaut that was going to be there,

24  and just to handle all the coordination with the SWAT

25  team, getting the, the affidavit finalized, putting it

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1    before a magistrate judge, having it signed, and just the

2    execution of the search itself.

3         Q    Did you review all the reports that had been

4    forwarded to you from the MCCU, the headquarters office

5    of the FBI that was coordinating this, this operation?

6         A    Yes.

7         Q    And did you become familiar with the scope of

8    the operation at that time?

9         A    Yes.

10        Q    You said that you coordinated the search.  Do

11   you remember the address of the location searched?

12        A    I think it was 2000 Smith Road in Hamilton,

13   Ohio.

14        Q    Okay.  Do you remember approximately what time

15   the search team made entry to the residence?

16        A    The search -- most of the search team waited,

17   but there were a few of us that went in right around

18   9:40, right after the SWAT team hit the house -- "hit" as

19   far as executing the entry.

20        Q    Okay.  And this was on October 16, 2014; is

21   that right?

22        A    That's correct.

23        Q    Your particular responsibility on that day was

24   an interview of the defendant; is that right?

25        A    Yes, with Dan Johns.

1        Q    Okay.  And do you see the person that you

2   interviewed in the courtroom today?

3        A    Yes.  He's sitting over here with the plaid

4   shirt on, white shirt, and gray or dark pants.

5             MS. PEIRSON:  Your Honor, let the record

6   reflect that the witness has identified the defendant.

7             THE COURT:  The record shall reflect that the

8   witness has identified the defendant, Jason Gmoser.

9   BY MS. PEIRSON:

10       Q    Who else was present during this interview?

11       A    Daniel Johns, another agent, and then there

12  were some search team people that came in and out during

13  that time period.

14       Q    Where in the residence did you do the inter--

15  did you conduct the interview?

16       A    There was an upstairs bedroom that we went to

17  because it was mostly vacant.

18       Q    And what time -- do you remember approximately

19  what time you started the interview?

20       A    We started it -- gosh, I think it was just a

21  little bit before 10:00 a.m.

22       Q    So the search team -- the search was executed

23  at about 9:40.

24       A    Uh-huh.

25       Q    Is it fair to say about 10, 15 minutes later is

1    when you started the interview?

2        A    Yes.  As soon as we could find space to do the

3    interview and sit down and -- yes.

4        Q    Okay.  I'm going to hand you what I've marked

5    as Government's Exhibit 9.  Actually, I'll go ahead and

6    hand you all three of these at the same time:

7    Government's Exhibit 9, 9A through 9K, and Government's

8    Exhibit 9A-TR through K-TR.

9             MS. PEIRSON:  Your Honor, if I may approach.

10            THE COURT:  You may approach.

11   BY MS. PEIRSON:

12       Q    Let's start with Government's Exhibit 9.  Do

13   you know what that is?

14       A    Government's Exhibit 9, it's the full Gmoser

15   interview, so this is the audio recording of the

16   interview that Dan Johns and I did.

17       Q    The entire interview?

18       A    The entire interview.

19       Q    How long is that interview?

20       A    It is just a little less than five hours.

21       Q    And is that your, your -- are those your

22   initials on that disk?

23       A    Yes.  Blue initials up on the right side.

24       Q    So you've reviewed that?

25       A    Uh-huh.

1    Q    Government's Exhibit 9A through 9K are all

2   contained on the second disk that I handed you, or marked

3   as such.  Do you know what that is?

4    A    These are the interview clips that have been

5   pulled from the entire interview to be played today, and

6   I did initial that, too.  I've also heard that.

7    Q    Are Government's Exhibit 9A through 9K clips of

8   the most relevant portions of the investigation, or of

9   the interview to this investigation?

10   A    I believe so.

11   Q    Okay.  And you said you had an opportunity to

12  review that and recognize your initials on Government

13  Exhibit 9A through 9K; is that right?

14   A    Correct.

15   Q    Okay.  I've also handed you a binder that's

16  marked as Government's Exhibit 9A-TR through 9K-TR.  Are

17  those fair and accurate transcripts that correspond to

18  the audio clips of 9A through 9K on the disk?

19   A    Yes.

20   Q    Okay.  In reviewing and preparing for trial,

21  did you note two clips that had a slight error in it?

22   A    Yes.

23   Q    Okay.  When we get to those clips, were those

24  clips 2 and 6?

25   A    I believe I noted them, and I brought in those,

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   those transcripts.  I believe they are.  But --

2        Q    Okay.

3        A    -- I'd have to look at it.

4        Q    Would looking at your notes refresh your

5   recollection as to which ones they were?

6        A    Yes.  And I put the page number on there as

7   well.

8        Q    Okay.

9             (Brief pause in proceedings.)

10            MS. PEIRSON:  Your Honor, if I may approach.

11            THE COURT:  You may.

12  BY MS. PEIRSON:

13       Q    Agent Kirschner, I'm going to hand you what

14  I've marked as Government's Exhibit 31 and then the notes

15  that you put on the actual two transcripts that you

16  noticed -- two transcript clips that you noticed there

17  was an error on.

18       A    Yes.

19       Q    Okay.  Did looking at your, the notes that you

20  took and reviewing the transcripts and your copies of the

21  transcript help you to remember which clips those were?

22       A    Yes.

23       Q    And which ones were they?

24       A    Clip 2, on page 13; and clip 6, on page 7.

25       Q    Okay.  Great.  I'm going to have you put those

 1   aside.  Do you still need those parts?  I'll have you

 2   hold on to them so you can point that out to the jury

 3   when we get to that part.

 4        A    Okay.

 5             MS. PEIRSON:  Your Honor, at this time, I would

 6   ask the Court to read into the record Stipulation Number

 7   6, which we've marked as Government's Exhibit 20F.

 8             THE COURT:  You said 6?

 9             6:  The parties stipulate and agree as follows:

10   The recorded interview of Jason T. Gmoser contained on

11   Government Exhibit 9 is a true and accurate copy of an

12   interview conducted with Jason T. Gmoser on October 16,

13   2014.

14             The recorded interview contained on Government

15   Exhibit 9 (and the excerpts contained in Government's

16   Exhibits 9A through K) accurately reproduces the words

17   spoken, the sounds of the speakers' voices as those words

18   were spoken, and those sounds that occurred at the time

19   the interview was recorded.

20             Further, the transcript of the excerpts

21   contained in Government's Exhibits 9A-TR through 9K-TR

22   are accurate transcriptions of the recorded interview to

23   which the transcript corresponds and accurately reflect

24   the words spoken by the speakers in that conversation.

25             Upon the jury's review of the transcripts, you

 1    will note that certain information in the body of the

 2    transcripts is in brackets.  The bracketed information is

 3    commentary included by the transcriber to parts of the

 4    recording that were inaudible or where background voices

 5    were indiscernible.  There is no stipulation between the

 6    parties as to whether the bracketed information in the

 7    transcripts is true and accurate.

 8            At this time, Mrs. Peirson, do you want to move

 9    to admit all of those exhibits?

10            MS. PEIRSON:  Yes, please, Your Honor.

11            THE COURT:  All right.  Government's Exhibits

12    9, 9A through 9K, 9-TR and 9A-TR through 9K-TR are

13    admitted.

14            MS. PEIRSON:  Your Honor, if I may, I have

15    transcript books prepared for the jury as well as the

16    Court, if I may pass those out.

17            THE COURT:  31?  Hold on.  The deputy's told me

18    about another exhibit.

19            MS. PEIRSON:  We don't need to admit 31, Your

20    Honor.  It's just a marked exhibit that Agent Kirschner

21    needed to refresh her recollection.

22            THE COURT:  Okay.

23            MS. PEIRSON:  And we've submitted a copy to

24    defense counsel.

25            THE COURT:  Back to your question about

1    transcript books, yeah, please -- the CSOs can help pass

2    those out.  If you can just hand them over to the CSOs,

3    and they'll make sure the jurors -- everyone gets a copy.

4           Before we start, if you don't have a transcript

5    book, please raise your hand.  No hands are raised.

6           You may proceed, Mrs. Peirson.

7    BY MS. PEIRSON:

8        Q    Agent Kirschner, I know Government's Exhibit 31

9    you wrote down a couple bullet points to help refresh

10   your recollection on a brief summary of what we will be

11   hearing through these exhibits.  To the extent that you

12   don't remember when I ask you to summarize each exhibit

13   before we play it, let me know, and we'll allow you to

14   refresh your recollection with Government's Exhibit 31.

15       A    Okay.  So you want me to tell you that each

16   time?  I was just going to go through it.

17       Q    Well, let me ask the questions about it.  To

18   the extent that you need to refresh your recollection,

19   just let me know; and we'll take a moment for you to do

20   that.  Okay?

21       A    Okay.

22       Q    So for clip 1, Agent Kirschner, can you give us

23   a summary of what we're going to be hearing in this first

24   part of the interview?

25       A    In clip 1, we're talking -- the general

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   introductions between the agents and Mr. Gmoser.  We

2   formally give him his Advice of Rights.  We make sure

3   that he's got something to drink and that he's

4   comfortable.  And we also tell him a little bit why we're

5   there, and we ask him -- after signing the Advice of

6   Rights form, we ask him a little bit of biological

7   background, educational information.

8       Q    What was his general demeanor like at this

9   point in the interview?

10      A    You know, I think like anybody that we ever go

11  to early in the morning like that, the surprise, he was,

12  I think, trying to take it all in and understand what was

13  going on.  But he was -- he seemed fine as far as just

14  calm and, and asking and trying to figure out what was

15  going on.

16      Q    Did he appear to understand what you were

17  telling him?

18      A    Yes.

19      Q    And what Agent Johns was describing for him?

20      A    Yes.

21      Q    Did he at any time during the interview appear

22  to respond to voices or sounds or other noises that were

23  inappropriate during the context of your communication?

24      A    No.

25      Q    Did he speak to individuals who were not

1    present in the room?

2         A    No.

3         Q    Did he make appropriate eye contact with you

4    throughout your interview?

5         A    Yes.

6         Q    Based on your observations -- did you have an

7    opportunity to walk around the residence and make

8    observations?

9         A    Yeah.  Not a lot of time, but I did go into the

10   other rooms.

11        Q    Your focus was the interview; --

12        A    Exactly.

13        Q    -- is that right?

14        A    Exactly.

15        Q    But based on your observations of the house,

16   did it seem fairly well maintained?

17        A    Yes.

18        Q    Did he say or do anything that caused you

19   concern about his ability to speak with you and

20   understand the course of the conversation?

21        A    No.

22             MS. PEIRSON:  Your Honor, at this time I would

23   move to publish Government's Exhibit 9A, which is the

24   first clip.

25             THE COURT:  You may do so.

```
 1                    (9A is published, 1:52 p.m. to 2:01 p.m.)

 2    BY MS. PEIRSON:

 3         Q    Agent Kirschner, during this clip, we heard you

 4    talk to the defendant about what he did for employment,

 5    and he told you he traded stocks.  Do you remember that

 6    part of the clip?

 7         A    Yes.

 8         Q    Were you able to verify if that's true?

 9         A    I was not -- there's no evidence of that.

10         Q    I'm going to hand you what I've marked as

11    Government's Exhibit 26.  Do you recognize that document?

12         A    Yes.

13         Q    What is it?

14         A    It's the Advice of Rights form that Dan Johns

15    is heard reading out loud, and then it was signed by Mr.

16    Gmoser and Dan and myself.

17         Q    Okay.  And you recognize your own signature on

18    that?

19         A    Yes.

20         Q    And you witnessed the defendant signing that

21    document; is that right?

22         A    Yes.

23              MS. PEIRSON:  Your Honor, I'd move to admit

24    Government's Exhibit 26.

25              THE COURT:  Any objection?
```

```
 1              MR. KRAEMER:  No objection.

 2              THE COURT:  Government's 26 is admitted at this

 3   time.

 4              MS. PEIRSON:  Madam Clerk, if we could just

 5   switch to the document projector.  If I may, I'd like to

 6   publish it at this time, Your Honor.

 7              THE COURT:  Please.

 8   BY MS. PEIRSON:

 9       Q    Agent Kirschner, we'll just start at the top.

10   Can you just point out for the jurors where the time and

11   the date on the Advice of Rights form was read?

12       A    Do I just press on this?

13       Q    Yeah.  If you just press on there.

14              THE COURT:  Just touch the screen.  There will

15   be an indication.

16       A    That will be the date, which was October 16th

17   of 2004; and you can see that we had written the wrong

18   date in and both initialed it and changed it.  And then

19   the time is 9:44 a.m. when we read him the rights.

20       Q    Okay.  And can you point out where on the

21   form -- and are these the rights verbatim that Agent

22   Johns read to the defendant in your presence?

23       A    Yes.

24       Q    Okay.  And then further down on the form, can

25   you point to where the defendant's signature is?
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1      A      Signature for Mr. Gmoser is here.

2      Q      And what about your signature and Agent Johns'

3   signature?

4      A      My signature is here in the blue, and Agent

5   Johns' is up above it.

6      Q      Okay.  Thank you, Madam Clerk.

7             Let's go to the second clip, Government's

8   Exhibit 9B.  Can you give us a summary, a brief summary

9   of what we're about to hear in this clip?

10      A      In this clip, we're continuing with some

11   introductory questions, and we're asking about some room

12   configurations in the house.

13             We're also talking about basic computer

14   knowledge; asking Mr. Gmoser if he understands certain

15   programs, if he knows anything about peer-to-peer, or --

16   he had talked earlier about bitcoin; asked him about Tor,

17   things like that.  That kind of gives us an idea about

18   whether he's going to be truthful and honest with us.

19      Q      Okay.

20             (9B is published, 2:05 p.m. to 2:21 p.m.)

21      Q      Agent Kirschner, in this clip that we just

22   listened, did he -- did the defendant deny or minimize

23   his computer knowledge and activity?

24      A      Very much so.

25      Q      Going to clip 3, Government's Exhibit 9C, can

1   you give us a brief summary of what we're going to hear

2   in this next clip?

3       A    In clip 3, Mr. Gmoser starts asking what he can

4   do to help himself and kind of starts negotiating for an

5   immunity that we told him we couldn't give him, but he's

6   talking about -- he's asking -- or talking about telling

7   us information about TLZ and giving us consent to take

8   over his identity both on TorChat and on TLZ as an

9   option.

10      Q    Why would that be valuable to obtain his

11  identity on TLZ?

12      A    Because that's how you can find other users,

13  other administrators, in this case.  You take over the

14  identities; you start chatting with these people, and you

15  find out more information about them and possibly

16  identify who they are.

17          MS. PEIRSON:  Your Honor, at this time, I'll

18  publish -- I'd like to publish clip 3, Government's

19  Exhibit 9C.

20          THE COURT:  9C?

21          MS. PEIRSON:  Yes, Your Honor.

22          THE COURT:  Please.

23          (9C is published, 2:33 p.m. to 2:36 p.m.)

24  BY MS. PEIRSON:

25      Q    And, Agent Kirschner, we're going to go to

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1   Government's Exhibit 9D.

 2            MS. PEIRSON:  And, Your Honor, this is a fairly

 3   brief clip.  I don't know if the Court wants to take the

 4   afternoon break after this clip or if I should just

 5   continue.

 6            THE COURT:  How short do you think it is?

 7            MS. PEIRSON:  This next clip is -- the

 8   transcript's only, like, three pages so --

 9            THE COURT:  Let's do that.  Then we'll take our

10   break.

11            MS. PEIRSON:  Okay.

12            THE COURT:  My target time was 2:45, so we're

13   on track.

14            MS. PEIRSON:  Okay.  I can continue.  I've got

15   more clips, but I just didn't know -- the ones after that

16   are longer.

17            THE COURT:  You're doing fine.  Show this

18   one -- or play this one, and then we'll take a break.

19   How about that?

20            MS. PEIRSON:  Okay.

21   BY MS. PEIRSON:

22       Q    Agent Kirschner, tell us about Government's

23   Exhibit 9D.  What, can you give us a brief summary of

24   what we're about to hear?

25       A    It's just more of a continuation of negotiation
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1   and "wanting to get back to the normal life" language,

 2   and then we also talk about the Consent to Assume Online

 3   Identity.

 4        Q    Okay.

 5             (9D published, 2:37 p.m. to 2:41 p.m.)

 6             THE COURT:  It's 2:41.  That's pretty close.

 7             MS. PEIRSON:  And that's all I have right now,

 8   Your Honor.

 9             THE COURT:  All right.  Ladies and gentlemen,

10   let's take our afternoon break.  I'll see you back in

11   about ten minutes.

12             (Jury absent, 2:41 p.m.)

13             THE COURT:  Have a seat.

14             Just to let everybody know in terms of timing,

15   those of our jurors going north are going to run into

16   some additional snow, and the National Weather Service

17   has just issued another alert for the Kankakee area.

18             So, Mrs. Peirson, as you go through these, I

19   definitely want to be done by 4:00.  If we could even get

20   done a little before 4:00, that might be good.  We have

21   some -- quite a few of our jurors seem to have -- we've

22   got some from Sullivan.  We have some north -- strangely,

23   we don't have a whole lot from around Champaign, which we

24   usually do.  I'm not worried about the ones headed down

25   to Sullivan; but the ones which are going north, which
```

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1  are quite a few, I want to get them out of here.  I'm not

2  going to tell you how to do your case.  So as we're

3  getting close to 3:45, that 15 minutes, it's not a big

4  deal to us, but it could be a big deal to them.

5          MS. PEIRSON:  I'll let you know if I can wrap

6  up somewhere close to 3:45, Your Honor.

7          THE COURT:  That would be great.  Thanks.

8  Everybody take about ten.  We'll come back.

9              (Recess, 2:43 p.m. to 2:53 p.m.)

10         THE COURT:  All right.  We're back on the

11  record.  It's 2:53, so we're exactly on time.

12         Mrs. Peirson, any reason not to bring the jury

13  back in?

14         MS. PEIRSON:  No, Your Honor.

15         THE COURT:  Mr. Kraemer?

16         MR. KRAEMER:  No, sir.

17         THE COURT:  Let's bring them in.

18         MS. PEIRSON:  Your Honor, if it's okay,

19  during -- the sixth clip is the longest.  It's about

20  almost, almost 50 minutes.  I'm going to go back and take

21  a seat at counsel table if you're okay with that.

22         THE COURT:  It's 50 minutes long?

23         MS. PEIRSON:  50 minutes, 49 minutes.  So we're

24  going to get through the next two clips at least.

25         THE COURT:  And then stop the next one

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

```
 1    somewhere part of the way through?
 2              MS. PEIRSON:  Well, we'll finish up on a clip.
 3    So the first one, I think, is 11; and the next one is, is
 4    50.
 5              THE COURT:  The next clip is 11?
 6              MS. PEIRSON:  Right.
 7              THE COURT:  That takes us to a little after
 8    3:00.  Then the next one is 50, so we're coming right up
 9    on 3:55?
10              MS. PEIRSON:  Yeah.  Do you want to stop there
11    or no?  I can stop it before if the Court wants to stop
12    it before.
13              THE COURT:  I'd rather stop, like, closer to --
14    when you see a stopping point in the clip, stop it closer
15    to 3:45.
16              MS. PEIRSON:  Okay.  And am I allowed to go sit
17    down?
18              THE COURT:  Oh, absolutely.  Absolutely.
19    Totally.
20              I think I'm going to tell them to come back
21    earlier tomorrow.  I'll give them 15 minutes today and
22    take away 15 minutes tomorrow.
23                   (Brief pause in proceedings.)
24                   (Jury present, 2:55 p.m.)
25              THE COURT:  Have a seat.  Have a seat.
```

1          Bad news, good news, bad news.  Bad news for

2    those of you headed north -- it's quite a few of you.

3    When we finished up that last clip, another weather alert

4    from the National Weather Service came up, and I looked

5    on the Doppler radar; and north on 57 past Onarga, it's

6    starting to look pretty bad.  That's the bad news.

7          The good news is because of that I'm going to

8    try to get everybody out of here about 3:45 today.  Those

9    of you going north, I want you to be safe.  And if you're

10   going up by 57, the east-west winds can be really bad.

11   So that's good news:  3:45.

12         Bad news:  Since I'm giving you 15 minutes

13   today, I'm taking it away tomorrow morning.  I'm going to

14   have you come in 15 minutes earlier tomorrow.

15         I'm looking at the longer range forecast for

16   tomorrow.  I'll probably still try to get you out of here

17   early because we're going to have -- mostly cloudy with

18   no snow, but it's going to get really cold tomorrow

19   afternoon and tomorrow night.  So I don't want people --

20   you know, some of you are driving on two-lanes roads.  I

21   don't want it to get icy and slick.  And, you know,

22   you're driving -- some of you are driving -- I think I

23   saw some of you are driving well over an hour, almost two

24   hours some of you; so that's our plan.  That's enough of

25   me talking, so we're going to try and stop about 3:45.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1              Mrs. Peirson, to you.

2              MS. PEIRSON:  Okay.

3    BY MS. PEIRSON:

4         Q    Agent Kirschner, we're now on Government's

5    Exhibit 9E, the fifth clip in this series.  Can you give

6    us a summary of this clip?

7         A    Sure.  It's, it's kind of formally reading the

8    Consent to Assume Online Identity form, and Mr. Gmoser

9    asked to put some information down about why he's doing

10   it.  He's doing it in consideration for a 5K1.1 motion

11   that we had talked about in the -- not part of these

12   clips but during the interview.  So he wants to do that.

13             He also identifies Usenet as the source of the

14   child pornography that he used to contribute to TLZ.

15             MS. PEIRSON:  Okay.  Your Honor, if I may

16   publish.

17             THE COURT:  You may publish.

18             (9E is published, 2:57 p.m. to 3:09 p.m.)

19   BY MS. PEIRSON:

20        Q    Agent Kirschner, I'm going to hand you what

21   I've marked as Government's Exhibit 27.

22             MS. PEIRSON:  Your Honor, may I approach?

23             THE COURT:  You may.

24        Q    Do you recognize that document?

25        A    Yes.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1      Q     What is it?

2      A     It's the Consent to Assume Online Identity

3  authorization form that was just referenced in the clip.

4      Q     Okay.  And is that your signature at the

5  bottom?

6      A     Yes.

7      Q     And did you witness the defendant also sign

8  that document?

9      A     Yes.

10     Q     As well as Agent Johns?

11     A     Yes.

12     Q     And on the back of that document, is that the

13  additional statement that the defendant discussed in his

14  clip?

15     A     Yes.

16           MS. PEIRSON:  Your Honor, I'd move to admit

17  Government's Exhibit 27.

18           MR. KRAEMER:  No objection, Your Honor.

19           THE COURT:  27 is admitted.

20           MS. PEIRSON:  Madam Clerk, if I could have the

21  document projector, please.

22           And, Your Honor, may I publish?

23           THE COURT:  You may publish.

24  BY MS. PEIRSON:

25     Q     Let's look at the top of this form.  Is this

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1   the Consent to Assume Online Identity that we heard read

2   into the, in the recording?

3       A    Yes.

4       Q    And did Agent Johns read that verbatim?

5       A    Yes.

6       Q    And about a third of the way down on the page,

7   can you point to the area of the screen where the account

8   names and the passwords, et cetera, are referenced?

9       A    The account name's here for TorChat, Argonaut;

10  and TLZ, Argonaut.  And as Agent Johns referenced, it was

11  a private key that we were going to pull off the computer

12  for the password.

13      Q    Okay.  And at the bottom of the page, can you

14  point to the defendant's signature, please?

15      A    Right here.

16      Q    And yours?

17      A    Over here.

18      Q    And Agent Johns'?

19      A    He's right here.

20      Q    Okay.  We'll flip the page over.  Okay.  And is

21  that the additional statement that the defendant wished

22  to write on the back of the form?

23      A    It is.

24      Q    And did you observe him write this statement?

25      A    Yes.

1      Q    Okay.  Now, throughout the clip he was asking

2  for your assistance in the particular terminology; is

3  that right?

4      A    That's correct.

5      Q    The section number.  But these are -- this is

6  his handwriting and his words; is that right?

7      A    Correct.

8      Q    And did you observe him also sign it?

9      A    Yes.

10     Q    Okay.  Let's go to clip 6, Government's

11  Exhibit's Exhibit 9F.  Can you give us a summary of what

12  we're going to hear in this clip?

13     A    In this clip, we're talking about, again, how

14  he can help us for cooperation.  He talks about chatting

15  with CWK on the TLZ site, and he also -- we asked him

16  about producers, if he knows any producers.  And he

17  admits to being a producer here, and he admits to

18  traveling to see a young boy out of state.

19     Q    Okay.

20          (9F is published, 3:12 p.m. to 3:43 p.m.)

21          MS. PEIRSON:  Your Honor, I think that might be

22  a good place to stop because it's the bottom of page 21

23  of the transcript, and then we can start the rest of it

24  in the morning.

25          I just have one quick question for Agent

 1   Kirschner before we pause at this point, if that's all

 2   right.

 3           THE COURT:  Go ahead.  We're doing well.

 4   BY MS. PEIRSON:

 5      Q    Agent Kirschner, are you aware if a child by

 6   the name of Gabriel was identified in Caldwell, Missouri?

 7      A    Gabriel Xxxxx, yes.

 8      Q    Okay.  And that's the subject of the video

 9   that's being discussed right now in this part of the

10   interview?

11      A    Yes.

12           MS. PEIRSON:  That's all.

13           THE COURT:  This is where you'd like to stop?

14           It's 3:44, right on time.  All right.  I'm

15   giving you 15 extra minutes today because -- yep, it

16   looks bad heading north of, heading up toward Kankakee.

17   Normally we try to bring you in here about 9:30.  Let's

18   try to get you in here at 9:15 tomorrow.  So try and be

19   in the jury room by 9:10.

20           If it get as cold as it says it's going to get

21   tomorrow, I'll try to get you out early as well tomorrow

22   but no guarantees.  I'm looking out for your best

23   interests, but I'm not going to guarantee anything.  All

24   right?

25           Oh, I almost forgot.  I have to read you the

1    sheet again.  All right.  We're about to take another

2    overnight break during the trial.  I want to remind you

3    of the instructions I gave you earlier.  Until the trial

4    is over, you are not to discuss the case with anyone,

5    including your fellow jurors, members of your family,

6    people involved in the trial, or anyone else.

7              Remember my instructions about social media,

8    especially no Facebook.

9              If anyone approaches you and tries to talk to

10   you about the case, do not tell your fellow jurors, but

11   advise me immediately about it.

12             Do not read or listen to any news reports of

13   the trial.

14             Finally, remember to keep an open mind until

15   all the evidence has been received and you have heard the

16   views of your fellow jurors.

17             I might not repeat these things to you before

18   every break we take -- because I don't -- but keep them

19   in mind through the trial.  Especially keep them in mind

20   as we take these nighttime breaks because that's when you

21   interact with your family and other people socially.

22   Stay off Facebook.  Don't talk to your family.  Don't

23   talk to your friends about the trial.  Well, you can talk

24   to your family, just not about this trial.  All right?

25             Try to be in here tomorrow morning at 9:10, and

1    we'll try to get you in here at 9:15.

2                    (Jury absent, 3:45 p.m.)

3                 THE COURT:  Have a seat.  Anything further you

4    wish to raise before our evening break, Mrs. Peirson?

5                 MS. PEIRSON:  No, Your Honor.  I forgot to ask

6    Mr. Kraemer if he wants the 404 -- 414 instruction or

7    "other acts evidence" instruction contemporaneous with

8    the evidence; but I think since we're in the middle of

9    it, we could still do it tomorrow morning.  So maybe he

10   could think about it and let me know, and I'll obviously

11   have the instructions in accordance with the Court's

12   order by tomorrow morning.

13                THE COURT:  I don't know.  At this point, Mr.

14   Kraemer, do you want me to read it at this point?

15                MR. KRAEMER:  No.

16                THE COURT:  No?  Okay.  I didn't think you did.

17   So, okay.  That's it unless you have -- Mr. Kraemer, I

18   didn't mean to leave you out.  Do you have anything you

19   want to raise before we break for tonight?

20                MR. KRAEMER:  No, sir.

21                THE COURT:  All right.  Be back here at 9:10,

22   and we'll try to get the jury in by 9:15.  We'll be in

23   recess.

24                    (Trial adjourned, 3:47 p.m.)

25                    * * * * * * * * * *

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/09/16)

1

2

3

4                    REPORTER'S CERTIFICATE

5         I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

6   that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8         Dated this 5th day of January, 2017.

9

10                    s/Lisa Knight Cosimini
                      _____
                      Lisa Knight Cosimini, RMR-CRR
11                    Illinois License # 084-002998

12

13

14

15

16

17

18

19

20

21

22

23

24

25